## ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA *v.* WOLFE.

No. 32.   Argued February 28, 1946.—Reargued November 12, 1946.— Decided June 9, 1947.

*Byron S. Payne* and *E. W. Dillon* argued the cause on the original argument, and *Mr. Dillon* on the reargument, for petitioner. With them on the brief was *Samuel Herrick.*

*Hubbard F. Fellows* argued the cause and filed a brief for respondent.

MR. JUSTICE BURTON delivered the opinion of the Court.

This is an action in a circuit court of the State of South Dakota, brought by an Ohio citizen against a fraternal benefit society incorporated in Ohio, to recover benefits claimed to have arisen under the constitution of that society as a result of the death of an insured member who had been a citizen of South Dakota throughout his membership. The case presents the question whether the full faith and credit clause of the Constitution of the United States [1] required the court of the forum, South Dakota, to give effect to a provision of the constitution of the society prohibiting the bringing of an action on such a claim more than six months after the disallowance of the claim by the Supreme Executive Committee of the society,[2]

---

[1] "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U. S. Const. Art. IV, § 1. See also, Act of May 26, 1790, 1 Stat. 122; Act of Mar. 27, 1804, 2 Stat. 298; Rev. Stat. §§ 905, 906, 28 U. S. C. §§ 687, 688.

[2] "No suit or proceeding, either at law or in equity, shall be brought to recover any benefits under this Article after six (6) months from

when that provision was valid under the. law of the state of the society's incorporation, Ohio, but when the time prescribed generally by South Dakota for commencing actions on contracts was six years[3] and when another statute of South Dakota declared that—

"Every stipulation or condition in a contract, by which any party thereto is restricted from enforcing his rights under the contract by the usual legal proceedings in the ordinary tribunals, or which limits the time within which he may thus enforce his rights, is void."[4]

We hold that under such circumstances, South Dakota, as the state of the forum, was required, by the Constitution of the United States, to give full faith and credit to the public acts of Ohio under which the fraternal benefit society was incorporated, and that the claimant was bound by the six-month limitation upon bringing suit to recover death benefits based upon membership rights of a decedent under the constitution of the society. This has been the consistent view of this Court.[5]

The record in the present case well illustrates both the practical effect of such a limitation as that contained in the constitution of this society and the need for the application of the full faith and credit clause to membership obligations in fraternal benefit societies.

---

the date the claim for said benefits is disallowed by the Supreme Executive Committee." From § 11 of Article IV, "Insurance," of the constitution of The Order of United Commercial Travelers of America, as printed on the back of the original certificate of membership issued to decedent August 19, 1920, and as in effect at the filing of this action June 15, 1934.

[3] § 2298, S. D. Rev. Code, 1919.

[4] § 897, S. D. Rev. Code, 1919.

[5] *Royal Arcanum* v. *Green*, 237 U. S. 531; *Modern Woodmen* v. *Mixer*, 267 U. S. 544; *Broderick* v. *Rosner*, 294 U. S. 629; *Sovereign Camp* v. *Bolin*, 305 U. S. 66. See also, *Pink* v. *A. A. A. Highway Express*, 314 U. S. 201, 207, 210–211.

590

The petitioner, The Order of United Commercial Travelers of America, was incorporated in 1888, under the general corporation laws of Ohio.[6] By 1920, when the decedent, Ford Shane, of Rapid City, South Dakota, be-

[6] As in effect September 1, 1930, and presumably at the member's death, May 8, 1931, the articles of incorporation contained only the following provisions:

"WITNESSETH: That we, the undersigned, all of whom are citizens of the State of Ohio, desiring to form a corporation, not for profit, under the general corporation laws of said State, do hereby certify:

"FIRST. The name of said corporation shall be THE ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA.

"SECOND. Said corporation shall be located, and its principal business transacted at Columbus, in Franklin County, Ohio.

"THIRD. The purpose for which said corporation is formed is:

"1st. To unite fraternally all Commercial Travelers, Wholesale Salesmen and such other persons of good moral character as are now or may hereafter become eligible to membership, under the provisions of the Constitution of the Order.

"2nd. To give all moral and material aid in its power to its members and those dependent upon them. Also to assist the widows and orphans of deceased members.

"3rd. To establish funds to indemnify its members for disability or death resulting from accidental means.

"4th. To secure just and equitable favors for Commercial Travelers and Wholesale Salesmen as a class.

"5th. To elevate the moral and social standing of its members.

"6th. Said corporation shall be a secret Order.

"7th. To establish a Widows' and Orphans' Reserve Fund."

This society is strikingly similar in form to the "fraternal beneficiary association," incorporated in Massachusetts in 1877 and described in the leading case on this subject, *Royal Arcanum* v. *Green,* 237 U. S. 531. As to that association it was said by the Supreme Court of Massachusetts that:

"The fraternal plan, with mutuality and without profit, distinguishes the work of such an association from a commercial enterprise. It is a charitable and benevolent organization, with a limitation of membership to a special class, and a limitation upon the choice of beneficiaries." *Reynolds* v. *Royal Arcanum,* 192 Mass. 150, 155, 78 N. E. 129, 131.

came a member, this fraternal benefit society was in active
operation in many states. Then, and at his death in 1931,
it was regulated in detail by the General Code of Ohio.
That Code included public acts of Ohio on such subjects
as the following: § 9462, Fraternal benefit society de-
fined; [7] § 9463, Lodge system; § 9464, Representative form
of government, including restrictions on amendments to
its constitution; § 9465, Exemption from general insurance
laws of the State; § 9466, Benefits; § 9467, To whom bene-
fits shall be paid, stating limitations on the degrees of
family relationship permitted to exist between a member
and those whom he may designate to receive benefits as
a result of his death; § 9468, Age limits for admission to
membership; § 9469, Certificate shall constitute agree-
ment; [8] § 9469-1, Exception as to commercial trav-

[7] "SEC. 9462. . . . Any corporation, society, order, or voluntary
association, without capital stock, organized and carried on solely for
the mutual benefit of its members and their beneficiaries, and not for
profit, and having a lodge system with ritualistic form of work and
representative form of government, and which shall make provision
for the payment of benefits in accordance with section 5 [G. C. § 9466]
hereof, is hereby declared to be a fraternal benefit society." Ohio
Gen. Code, 1931.

[8] "SEC. 9469. . . . Every certificate issued by any such society
shall specify the amount of benefit provided thereby, and shall pro-
vide that the certificate, the charter or articles of incorporation, of,
if a voluntary association, the articles of association, the constitution
and laws of the society and the application for membership and
medical examination, signed by the applicant, and all amendments
to each thereof, shall constitute the agreement between the society
and the member, and copies of the same certified by the secretary of
the society, or corresponding officer, shall be received in evidence of
the terms and conditions thereof, and any changes, additions or
amendments to such charter or articles of incorporation, or articles
of association, if a voluntary association, constitution or laws duly
made or enacted subsequent to the issuance of the benefit certificate
shall bind the members and his beneficiaries, and shall govern and
control the agreement in all respects the same as though such changes,

592

elers; [9] § 9470, Investment, disbursement and application of funds; § 9481, Laws of society shall be binding on members and beneficiaries, and the society may provide, as here, that no subordinate body, officers or members may waive any of the provisions of the laws and constitution of the society.[10] These public acts have created and regulated the society and the rights and obligations of its members. They are reflected in its articles of incorporation, constitution and by-laws. They make possible uniformity of rights and obligations among all members throughout the country, provided full faith and credit are given also to the constitution and by-laws of the society insofar as they are valid under the law of the state of incorporation. If full faith and credit are not given to these provisions, the mutual rights and obligations of the members of such societies are left subject to the control of each state. They become unpredictable and almost inevitably unequal.

The principal office of this society has been continuously in Columbus, Ohio. The society has established subordinate councils in many states and, at all times involved in this case, has been licensed to do business in South

additions or amendments had been made prior to and were in force at the time of the application for membership." Ohio Gen. Code, 1931.

[9] "SEC. 9469–1. . . . The provisions of section ninety-four hundred and sixty-nine of the General Code, requiring the certificate to specify the maximum amount of benefit provided thereby and the conditions governing the payment thereof, shall not apply to the certificates of a fraternal beneficiary association organized under the laws of Ohio, whose membership consists of commercial travelers and which does not obligate itself to pay stipulated amounts of benefits in case of natural death." Ohio Gen. Code, 1931.

[10] "SEC. 9481. . . . The constitution and laws of the society may provide that no subordinate body, nor any of its subordinate officers or members shall have the power or authority to waive any of the provisions of the laws and constitution of the society, and the same shall be binding on the society and each and every member thereof and on all beneficiaries of members." Ohio Gen. Code, 1931.

Dakota as a foreign fraternal benefit society.[11]   In accordance with the requirements for maintaining such license in good standing, the society has kept on file, with the Commissioner of Insurance of South Dakota, a copy of the society's constitution, including § 11 of Article IV, here

[11] S. D. L., 1919, c. 232, § 16, authorized the issuance of such a license—

"upon filing with the Commissioner a duly certified copy of its charter or articles of association; a copy of its constitution and laws, certified by its secretary or corresponding officers; a power of attorney to the Commissioner [to accept service of process] . . . ; a statement of its business under oath of its president and secretary, or corresponding officers, in the form required by the Commissioner, duly verified by an examination made by the supervising insurance official of its home State or other State satisfactory to the Commissioner of Insurance of this State; a certificate from the proper official in its home State, province or country, that the society is legally organized; a copy of its contract, which must show that benefits are provided for by periodical, or other payments by persons holding similar contracts; and upon furnishing the Commissioner such other information as he may deem necessary to a proper exhibit of its business and plan of working, and upon showing that its assets are invested in accordance with the laws of the State, territory, district, province or country where it is organized, he shall issue a license to such society to do business in this State until the first day of the succeeding March, and such license shall, upon compliance with the provisions of this Act, be renewed annually, but in all cases to terminate on the first day of the succeeding March; provided, however, that license shall continue in full force and effect until the new license be issued or specifically refused.   Any foreign society desiring admission to this State, shall have the qualifications required of domestic societies organized under this Act, upon a valuation by any one of the standards authorized in Section 23a of this Act, and have its assets invested as required by the laws of the State, territory, district, country, or province where it is organized.   For each such license or renewal the society shall pay the Commissioner Two ($2.00) Dollars.   When the Commissioner refuses to license any society, or revokes its authority to do business in this State, he shall reduce his ruling, order or decision to writing and file the same in his office, and shall furnish a copy thereof, together with a statement of his reason, to the officers of the society, upon request, and the action

594

in controversy, limiting the time for bringing suits to recover claims for benefits based upon that Article. The state of the forum thus has been continuously in a position to revoke or refuse to renew the society's license to do business in that State if it had good reason to do so. There is no evidence that South Dakota has attempted or suggested such action. The favorable, rather than hostile, attitude of South Dakota towards such societies is evidenced by its own authorization of their incorporation in that State on terms identical, word for word, with those prescribed in Ohio.[12]

The decedent, on July 31, 1920, applied for membership in the society through Rapid City Council No. 516, in Rapid City, South Dakota. He was 37 years old, a manager and salesman selling "packing products" on the road, in good physical condition and employed in an occupation of precisely the type contemplated for membership in this society.[13] He named his wife as his beneficiary in case of

of the Commissioner shall be reviewable by proper proceedings in any court of competent jurisdiction within the State, . . . ."

See also, §§ 31.2124–31.2126, 31.2139, S. D. Code of 1939. The State of Ohio has similar provisions in its Code. § 9477, Ohio Gen. Code, 1931.

[12] "An Act Providing for the Regulation and Control of All Fraternal Benefit Societies," approved Mar. 11, 1919, S. D. L., 1919, c. 232, pp. 240–253. For example, § 1 defines them as follows:

"Any corporation, society, order, or voluntary association, without capital stock, organized and carried on solely for the mutual benefit of its members and their beneficiaries, and not for profit, and having a lodge system with ritualistic form of work and representative form of government, and which shall make provision for the payment of benefits in accordance with Section 5 hereof, is hereby declared to be a Fraternal Benefit Society."

See also, c. 31.21, "Fraternal Benefit Societies," S. D. Code of 1939, and cf. with Ohio definition in note 6, *supra*.

[13] "SEC. 2. Any white male citizen of the United States or British possessions in North America of good moral character and good general health, not under eighteen (18) and not over sixty (60) years of age,

his death from accidental means. On August 19, 1920, he was accepted by the Supreme Council as an insured member of the society under "Class A." The certificate, No. 169655, evidencing this acceptance was executed at Columbus, Ohio, by the Supreme Counselor and Supreme Secretary. In 1922, following a brief suspension, he applied for reinstatement in what was then Black Hills Council No. 516 in Rapid City, South Dakota, and, on December 21, 1922, was reinstated as an insured member of the society under "Class A." In his application for this renewal, he referred to himself as a traveling salesman, selling meat to dealers, and named his mother, Elizabeth Shane of Mt. Vernon, South Dakota, as his beneficiary.[14]

who has been actively and actually engaged for a term of not less than six months immediately preceding the date of his application as a commercial traveler, city salesman, wholesale house salesman, sales manager or merchandise broker, selling goods at wholesale or selling office, store, factory, railroad, mill or municipal equipment, for a manufacturer or wholesale dealer, or one who has had at least six months experience in either of the occupations named herein, and is thus engaged at the date of filing the application, and who is in good mental and physical condition may become a member of this Order if found acceptable." Art. II, constitution of the society, 1922.

[14] The certificate, No. 169655, then issued to him, and which is the primary basis for the respondent's claim, is as follows:

"INCORPORATED UNDER THE GENERAL LAWS OF THE STATE OF OHIO.

CLASS A

INSURANCE CERTIFICATE

THE ORDER OF
UNITED COMMERCIAL TRAVELERS
OF AMERICA

COLUMBUS, OHIO

"An Association incorporated under the laws of the state of Ohio, hereby certifies that Ford Shane, a member of The Order of United Commercial Travelers of America, in consideration of the statements

Thereafter, he remained in good standing and it is upon his membership, evidenced by this certificate, also executed in Ohio, that this action depends. On May 8, 1931, he visited a physician's office in Rapid City, South Dakota, to be examined for stricture. The doctor applied a local anesthetic preliminary to introducing an instrument known as a "sound" for exploratory purposes. The local anesthetic was a drug known as "butyn." The record shows that butyn commonly was used by physicians for such a purpose; that it was properly administered in the usual and proper amount and was of the usual and proper strength; but that the decedent, unknown to anyone, was subject to a

contained in his application for insurance and the application fee paid by him, is hereby accepted as an Insured Member of said Order under 'Class A,' beginning at twelve (12) o'clock, noon, Standard time, on the day this certificate is dated, and is entitled to all the rights and benefits which may be provided for such 'Class A' Insured Members in and by the Constitution of said Order in force and effect at the time any accident occurs subsequent to said time and date.

"This Certificate, the Constitution, By-Laws and Articles of Incorporation of said Order, together with the application for insurance signed by said Insured Member, shall constitute the contract between said Order and said Insured Member and shall govern the payment of benefits, and any changes, additions or amendments to said Constitution, By-Laws or Articles of Incorporation, hereafter duly made, shall bind said Order and said Insured Member and his beneficiary or beneficiaries, and shall govern and control the contract in all respects.

"In Witness Whereof, we have affixed our signatures and the seal of the Supreme Council, at Columbus, Ohio, this 21st day of December A. D. 1922.

"This certificate supersedes all insurance certificates issued of a prior date bearing this number.

s/ Frank J. Rosser
*Supreme Counselor.*

s/ Walter D. Murphy
*Supreme Secretary."*

SEAL

rare idiosyncrasy, as a result of the presence of which he suffered convulsions immediately following the administration of the anesthetic and died within two minutes.

In accordance with the procedure prescribed in the constitution of the society, the decedent's beneficiary promptly mailed to the society a notice of her son's death. On June 8, 1931, the Supreme Executive Committee, in Columbus, Ohio, reviewed and disallowed her claim on its merits and mailed to her notice of such action. On June 16, she filed a complaint against the society in a circuit court for the State of South Dakota to recover death benefits, amounting to $6,300, claimed under Article IV of the constitution of the society. The case was removed to the United States District Court for South Dakota because of diversity of citizenship. On September 2 it was tried, without a jury, and, on December 15, 1931, judgment was rendered for the mother with findings of fact and conclusions of law dealing with the merits of the case. This judgment, on February 27, 1933, was reversed, on its merits, by the United States Circuit Court of Appeals for the Eighth Circuit and judgment for costs was entered against Elizabeth Shane. 64 F. 2d 55.[15] Upon remand

[15] The Circuit Court of Appeals evidently relied, in part, on Article IV, § 7, of the constitution of the society which stated "Nor shall benefits under this Article be payable unless external, violent and accidental means, producing bodily injury, is the proximate, sole and only cause of death, disability or loss" and said:

"There were no accidental means, but simply an unexpected or accidental result. The administration of the drug did not cause the idiosyncrasy, and, if the bodily injury which resulted in death was produced by the idiosyncrasy as a cause or means, then the administration of the drug was not the sole cause, and there would be no liability under the policy." 64 F. 2d 55, 59.

Relating to a provision in the same section that "This Order shall not be liable to any person for any benefits for any death, . . . resulting from . . . medical, mechanical or surgical treatment (except

598

of the case to it, the District Court, on April 18, 1933, ordered "that the Judgment of the United States Circuit Court of Appeals in this matter be made the Judgment of this Court, and that all costs of this Court relating to such Mandate and Judgment, be taxed and allowed the defendant." (Unreported.) Thus, within less than two years, the case had been completely presented and heard by the District Court and the Circuit Court of Appeals and disposed of, on its merits, in favor of the society, with full recognition of the diversity of citizenship of the parties and in compliance with the time limits prescribed by the constitution of the society.

The present proceeding, however, resulted from the fact that, pursuant to stipulation of the parties, the District Court, on January 18, 1934, dismissed the case without prejudice to the filing of another suit. On June 15, 1934, the decedent's mother assigned her claim to Edward C. Wolfe, the present respondent, a citizen of Ohio, as trustee, to enforce collection of the claim. On the same day, the present action was filed in a circuit court of the State of South Dakota. An answer was entered and a stipulation was made to use the testimony which had been taken in the District Court in the previous case. There the case rested for six years. On October 19, 1940, an amended answer was filed raising, among others, the defense that this second action was in violation of the following Section of the constitution of the society:

where the surgical treatment is made necessary by the accident), the intentional taking of medicine or drugs"; the Circuit Court of Appeals said:

"We think the administering of the drug must be placed in the category of medical or surgical treatment.

.        .        .        .        .

"If the administering of the drug in the case at bar did not constitute medical or surgical treatment, we should be at a loss how to classify such act." *Id.* at 59–60.

## "ARTICLE IV.   INSURANCE.

### Waivers.

"Sɛᴄ. 11. No suit or proceeding, either at law or in equity, shall be brought to recover any benefits under this Article after six (6) months from the date the claim for said benefits is disallowed by the Supreme Executive Committee.

"No Grand or Subordinate Council, officer, member or agent of any Subordinate, Grand, or the Supreme Council of the Order is authorized or permitted to waive any of the provisions of the Constitution of this Order, relating to insurance, as the same are now in force or may be hereafter enacted."

It is not disputed that such provision has been in such constitution since before the decedent's first application for membership in the society, and that it was printed in full on the back of the certificate of membership originally issued to the decedent.   It further was alleged that this provision was valid and binding upon the members of the society by and under the laws of Ohio; that the highest court of that State had held that a fraternal benefit society, by its constitution and by-laws, could limit the time within which suit must be brought to recover for benefits promised to members; and that to deny the binding effect of that limitation on the plaintiff in such suit would be a violation of the full faith and credit clause of the Constitution of the United States (Art. IV, § 1), and a violation of the society's rights thereunder.   We decide that issue here in favor of the society.   No claim is made here that the society is barred from this defense by any waiver purporting to have been made on its behalf in connection with the dismissal of the earlier action without prejudice to filing another.   See *Riddlesbarger* v. *Hartford Ins. Co.,*

7 Wall. 386. In this view of the case, it is not necessary to consider the other defenses.

In 1942, the case was presented before a judge of a circuit court of the State of South Dakota. Upon the death of that judge before a decision in the case, it was heard, in 1943, by another judge of that court, largely upon the record made, in 1931, in the United States District Court. The state court, on April 4, 1944, entered judgment in favor of the claimant, respondent herein. In 1945, the Supreme Court of the State of South Dakota, by a divided court, affirmed that judgment. 70 S. D. 452, 18 N. W. 2d 755. Because of the constitutional issue presented and its relation to previous decisions of this Court, we granted certiorari. 326 U. S. 712. The case was argued here February 28, 1946. Later it was restored to the docket, assigned for reargument before a full bench and reargued here November 12, 1946.

This is a clear-cut case of a claim based solely upon membership rights and obligations contained in the constitution of an incorporated fraternal benefit society, the terms of which are subject to amendment through the processes of a representative form of government authorized by the law of the state of incorporation. There is no evidence in the records of the three trials, no suggestion in the opinions of the lower courts, and no claim in the arguments here that the decedent was not a bona fide active member of the society, or that the society was acting otherwise than as a fraternal benefit society. This case, therefore, is to be distinguished from a claim for death benefits under an ordinary contract of accident insurance, whether issued by a stock or a mutual insurance company.

We rely upon the character of the membership obligation sued upon. There is substantial evidence to support a contention that the contract of membership, including all insurance rights, was made in Ohio and that many

acts in connection with the contract were required to be performed in Ohio and were so performed. However, we do not rely upon the place of concluding the contract of membership or upon the place prescribed for its performance. We rely, rather, upon its character as something created, regulated and subject to change through a fraternal and representative form of intra-corporate government, dependent for its terms, continuity and unity upon public acts of Ohio creating and regulating fraternal benefit societies.

Although the respondent, suing as an Ohio citizen, has eliminated the South Dakota citizenship of the original beneficiary as a jurisdictional factor in this case, we do not hold that, for that reason, he may not urge the courts to consider the continuous South Dakota residence and citizenship of the decedent and of the named beneficiary in determining whether the public policy of South Dakota should yield to the full faith and credit clause of the Constitution of the United States in giving recognition to the charter rights and obligations of the society as an Ohio corporation.

In order, however, to appreciate the nature of the obligation here relied upon, it is essential to see how completely its terms are interwoven with the enabling legislation authorizing the corporate charter and with the constitution and by-laws of the society, as well as with the member's application for and his certificate of membership in such society.

The enabling legislation, corporate charter and certificate of membership have been described. The application for membership contributes nothing further to the issue except to emphasize the integration which it demonstrates between the member and the articles of incorporation, constitution and by-laws of his society. There was no application for insurance separate from the applica-

tion for membership.   Benefits derived from membership flowed solely from the decedent's membership status.

There remain to be considered the constitution and by-laws of the society.   These set forth the main body of the member's rights and obligations, including those of a fraternal and procedural nature as well as those relating to financial benefits and liabilities.   The principal part of the record consists of printed copies of the charter, constitution and by-laws of the society, one as generally effective September 1, 1922, and the other as effective September 1, 1930.   A comparison of these copies shows that many changes were made in the rights and obligations of members during the decedent's membership in the society.[16]

The 1930 constitution, in pamphlet form, filled 90 closely printed pages.   Its subject matter is outlined in the margin.[17]   It is obvious how vital these terms, both in detail and as a whole, were to each member.   The by-laws filled six pages.   They consisted of 29 paragraphs

---

[16] Typical of these changes were those relating to the distribution, on a changed percentage basis, of funds raised by calls to meet insurance and other needs; changes in the classification of employments to be treated as hazardous enough to require the lowering of rates of disability benefits to be paid to members employed in them; and a new provision expressly recognizing the rights of uninsured members to continue as members of the society, although disqualified physically from taking advantage of insurance benefits.   There also was a change in the procedure governing future amendments.

[17] The 1930 constitution dealt with the following subjects and it is in them, as amended from time to time, that there can be found the rights and obligations of the members:

Article I. Name, Objects, Provision for Subordinate Councils, Grand Councils and The Supreme Council.

Article II. Subordinate Councils, Membership, Withdrawals, Transfer Cards, Delinquency, Suspensions, Reinstatement, Uninsured Membership, Officers and Elections, Duties of Officers, Vacancies in Office, Honorary Titles, Meetings and Quorum, Special Sessions, Reports, Per Capita Tax to Council having control and jurisdiction over the

dealing with the conduct of meetings of the Subordinate (or local) Councils, Grand (or regional) Councils and the Supreme (national or international) Council. Under such a constitution it is impossible to separate the mem-

Subordinate Council, and Representation of Subordinate Councils in the Grand Council.

Article III. Funds, Provision for Widows' and Orphans' Fund, Assessment Fund, Distribution of Assessment Fund, Death Fund, Disability Fund, General Expense Fund and Reserve Funds. The Assessment Fund is created by assessments on insured members, in good standing, to provide a basis for meeting assessment calls. When calls are made upon such members, the proceeds are apportioned 30% to the Death Fund, 40% to the Disability Fund, 5% to the Reserve Funds and 25% to the General Expense Fund.

Article IV. Insurance. Members in good standing are subject to regular quarterly calls of $3 per insured member and the Supreme Counselor has the right to make as many calls, in an amount not to exceed $3 each, as may be required to pay in full all valid claims, together with expenses incurred in maintaining the society and conducting its business. Based on their physical condition, members become insured members of Class A or Class B. Those providing the poorer risk are put in Class B and are entitled to benefits of but one-half the amount of those provided for Class A members. The benefits are in the nature of indemnities against the result of bodily injuries "effected through external, violent and accidental means, . . . which shall be occasioned by the said accident alone and independent of all other causes." There are many limitations upon this liability and, in case of certain changes in the occupation or physical condition of a member, his right to benefits may be reduced or canceled. There are double indemnities for injuries resulting from accidents on passenger trains, etc., and the coverage generally is related to risks normally encountered by commercial travelers. Specific exemptions are made of injuries resulting from engaging in certain hazardous sports or from being under the influence of liquor, etc. Those who may be named as beneficiaries are limited to specified degrees of family relationship. (The form of application makes express reference to the limitations as to beneficiaries contained in the statutes of Ohio.) Provision is made for notices and proofs of claims, for surgical examinations, etc. There is a strict prohibition in § 11 (quoted *supra*) against the waiver of provisions of the constitution and, in the same Section, there appears the six-month limitation,

ber's insurance rights and obligations from his other rights and obligations. While the statute authorizing the incorporation of fraternal benefit societies calls for "a lodge system with ritualistic form of work" and this is a natural

here in controversy, upon the time within which to bring suits to recover benefits after a claim has been disallowed by the Supreme Executive Committee.

Article V. Grand Councils, Charters for Subordinate Councils, Per Capita Tax payable to Grand Councils and detailed provisions for the operation of Grand Councils.

Article VI. Supreme Council, Charters for Grand Councils, Officers and Elections and detailed provisions for the conduct of the business of the Supreme Council, including the establishment of the Supreme Executive Committee. This committee is to consist of seven members, including the Supreme Counselor, Supreme Secretary, Supreme Treasurer and four specially elected members. It has large powers over the business and activities of the society. Among these provisions are those of examining insurance claims, deciding upon their validity and adjusting them.

Article VII. Prohibition of the use of malt or spirituous liquors in connection with meetings of the society.

Article VIII. Memorial Day in honor of the society's first Supreme Secretary.

Article IX. Special duty of every member to report the name of any member who is an extra hazardous, physical or moral risk.

Article X. Prohibition against donations of funds of the society.

Articles XI, XII and XIII. Trials, Penalties and Appeals relating to violations of the Constitution, By-Laws and Rules, and the divulging of secrets of the society or conduct unbecoming a gentleman.

"ARTICLE XIV. AMENDMENTS. Section 1. Proposed amendments to this Constitution, By-Laws and Articles of Incorporation shall be submitted in writing and filed with the Supreme Secretary of the Order at least six (6) months before the convening of the annual session of the Supreme Council.

"The Supreme Secretary of the Order shall, at least four (4) months before the convening of such annual session, forward to all Grand and Subordinate Councils a copy of the proposed amendments.

"SEC. 2. No amendment to the Constitution, By-Laws or Articles of Incorporation shall be adopted unless it receives the affirmative vote of at least two-thirds (2–3) [2/3] of the members of the Supreme

expression of a close community of interest among members of a fraternal benefit society, yet it is not the formality of any ritual that is of primary significance from the legal point of view in this case.   The more critical factors are that the society is a voluntary fraternal association "organized and carried on solely for the mutual benefit of its members and their beneficiaries, and not for profit, and having a . . . representative form of government, and which shall make provision for the payment of benefits" in accordance with certain statutory requirements.[18] Historically, many groups of people have been drawn together naturally into fraternal organizations for social and economic reasons.   Some of these have developed into those forms of fraternal benefit societies now officially recognized by many states.   The relationships between the members of such societies are contractual in that they are voluntarily undertaken in consideration of the like obligations of others.   However, interwoven with their financial rights and obligations, they have other common interests incidental to their memberships, which give them a status toward one another that involves more mutuality of interest and more interdependence than arises

---

Council present, entitled to vote, at the session when such amendment is voted upon.

"SEC. 3. All amendments to this Constitution, By-Laws and Articles of Incorporation shall take effect on the first day of September following the session of the Supreme Council at which they were adopted, unless the date for becoming effective is otherwise specified by the Supreme Council.

"SEC. 4. All recommendations or resolutions adopted by the Supreme Council which adds [add] to or conflict with this Constitution or By-Laws shall be presented to the Supreme Council at its next annual session as an amendment to the Constitution or By-Laws and shall not become effective until such amendments have been approved by a two-thirds vote of the members present entitled to vote."   (Section 4 was added between 1922 and 1931.)

[18] See note 7, *supra.*

from purely business and financial relationships. This creates—

> "The indivisible unity between the members of a corporation of this kind in respect of the fund from which their rights are to be enforced and the consequence that their rights must be determined by a single law, . . . . The act of becoming a member is something more than a contract, it is entering into a complex and abiding relation, and as marriage looks to domicil, membership looks to and must be governed by the law of the State granting the incorporation." [19]

The relationship thus established between a member and his fraternal benefit society differs from the ordinary contractual relationship between a policyholder and a separately owned corporate or "stock" insurance company. It differs also from that between an insured member of the usual business form of a mutual insurance company and that company. The fact of membership in the Ohio fraternal benefit society is the controlling and central feature of the relationship. As long as he remains a member, the terms of his membership, including obligations and benefits relating to the insurance funds of the society, are subject to change without his individual consent. The control over those terms is vested by him and his fellow members in the elected representative government of their society as authorized and regulated by the law of Ohio. Upon that law the continued existence of the society depends. The foundation of the society is the law of Ohio. It provides the unifying control over the rights and obligations of its members. *Sovereign Camp* v. *Bolin*, 305 U. S. 66, 75, discussed *infra*. It is this dependence of membership rights upon the public acts of the domiciliary state, supported by the requirement that

---

[19] *Modern Woodmen* v. *Mixer*, 267 U. S. 544, 551.

full faith and credit shall be given in each state to those public acts, that has been recognized by this Court in the unbroken line of decisions reviewed in this opinion.

The decisions passing upon this comparatively narrow issue are to be distinguished from those which deal only with the well-established principle of conflict of laws that "If action is barred by the statute of limitations of the forum, no action can be maintained though action is not barred in the state where the cause of action arose." Restatement, Conflict of Laws § 603 (1934). It is to that general principle that such early cases as *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, and *M'Elmoyle* v. *Cohen,* 13 Pet. 312, have reference. The decisions here reviewed are to be distinguished, likewise, from those supporting the converse general principle that "If action is not barred by the statute of limitations of the forum, an action can be maintained, though action is barred in the state where the cause of action arose." Restatement, Conflict of Laws § 604 (1934). Neither of these general statements is here questioned. An obvious need for modification of the latter statement, however, has led many states to place a limitation upon it through the adoption of the so-called "borrowing statutes" of limitations. The result is that today "Statutes frequently provide that an action may not be maintained if it has been barred by the statute of limitations at the place where the action accrued or, in some cases, at the domicil of the defendant." *Id.* § 604, comment *b.* These numerous "borrowing statutes" demonstrate the general recognition of the sound public policy of limiting, under some circumstances, the application of the general statute of limitations of the state of the forum. The full faith and credit clause applied, as in the present case, is but another limitation voluntarily imposed, by the people of the United States, upon the sovereignty of their respective states in applying the law of the forum. See *Broderick* v. *Rosner,* 294 U. S. 629, 643, and *Milwaukee*

*County* v. *White Co.,* 296 U. S. 268, 276–277, discussed *infra.*

Even without the compelling force of statutory or constitutional provisions, the courts have recognized other restrictions on the law of the forum. For example, it is well established that, in the absence of a controlling statute to the contrary, a provision in a contract may validly limit, between the parties, the time for bringing an action on such contract to a period less than that prescribed in the general statute of limitations, provided that the shorter period itself shall be a reasonable period.[20] Such shorter periods, written into private contracts, also have been held to be entitled to the constitutional protection of the Fourteenth Amendment under appropriate circumstances. See *Home Ins. Co.* v. *Dick,* 281 U. S. 397, and *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.,* 292 U. S. 143, mentioned again *infra.*

The instant case presents additional facts which distinguish it from the cases governed by the foregoing general rules. The principal distinguishing feature of this case is the membership of the decedent in the Ohio fraternal benefit society, which South Dakota made available to him through the license issued to it to do business in South Dakota. Even conceding, for purposes of argu-

---

[20] "The policy of these statutes [of limitation] is to encourage promptitude in the prosecution of remedies. They prescribe what is supposed to be a reasonable period for this purpose, but there is nothing in their language or object which inhibits parties from stipulating for a shorter period within which to assert their respective claims." *Riddlesbarger* v. *Hartford Ins. Co.,* 7 Wall. 386, 390; approved, *Thompson* v. *Phenix Ins. Co.,* 136 U. S. 287, 298.

See also, *Appel* v. *Cooper Ins. Co.,* 76 Ohio St. 52, 80 N. E. 955; *Bartley* v. *National Business Men's Assn.,* 109 Ohio St. 585, 143 N. E. 386; *Young* v. *Order of United Commercial Travelers,* 142 Neb. 566, 7 N. W. 2d 81; *Burlew* v. *Fidelity & Casualty Co. of N. Y.,* 276 Ky. 132, 122 S. W. 2d 990; see note, 121 A. L. R. 758; 29 Am. Jur. 1039.

ment, that the decedent's membership contract was entered into in South Dakota, rather than where it was accepted at the society's home office in Ohio, it is the character of that fraternal benefit membership, created and defined by the laws of Ohio and fostered by the fraternal benefit laws of South Dakota, that is at issue. Conceding further that, as interpreted in this case by the Supreme Court of South Dakota, the provision of § 897 of the South Dakota Code (quoted near the beginning of this opinion), generally outlawing contractual time limits on the enforcement of contractual rights by legal proceedings, is an attempt to make void the time limit included in § 11 of Article IV of the constitution of this Ohio fraternal benefit society, we then are brought face to face with the full faith and credit clause of the Constitution of the United States. It is here that we reach the line of decisions of this Court, extending from *Royal Arcanum* v. *Green*, 237 U. S. 531, to *Pink* v. *A. A. A. Highway Express*, 314 U. S. 201, 207–208, 210–211, discussed *infra*. These decisions are directly in point. Without questioning this Court's recognition of the common law principle of conflict of laws as to the control by each state over the application of its own statutes of limitations, this line of decisions demonstrates this Court's simultaneous recognition of the necessary scope of the full faith and credit clause in this field. These cases unwaveringly safeguard, in each state, the effectiveness of the public acts of every other state as expressed in the rights and obligations of members of fraternal benefit societies. Such societies exist by virtue of such state legislation, and the rights and obligations incident to membership therein are as much entitled to full faith and credit as the statutes upon which they depend.

The respondent's claim to benefits is based upon Item (12) of § 4 of Article IV of this constitution which specifies

the death benefits derived from the membership of "Class A" members. The prohibition limiting the time for suing on this claim, which is relied upon as the defense of the society, appears as § 11 of the same Article IV. Section 11 deals with the decedent's membership relationship to the society no less than does § 4. The limitation, resulting from § 4, on the amount of the benefit to be paid to beneficiaries and the limitation, resulting from § 11, on the time when litigation may be brought by beneficiaries, are of comparable character. To permit recovery here would be to permit recovery on a special and unauthorized type of membership more favorable to decedent than was available to other members. This would fail to give full faith and credit to the terms of membership authorized by Ohio by placing an additional liability on the society beyond that authorized by Ohio or accepted by the society.

Underlying the defense of the society is the requirement that § 11 be valid under the law of Ohio as the State of incorporation. Such validity was admitted by the Supreme Court of South Dakota in its opinion below. 70 S. D. 452, 18 N. W. 2d 755, 756. "The parties to a contract of insurance may, by a provision inserted in the policy, lawfully limit the time within which suit may be brought thereon, provided the period of limitation fixed be not unreasonable." *Appel* v. *Cooper Ins. Co.*, 76 Ohio St. 52 (Syllabus, No. 1, by the court), 80 N. E. 955. The court there enforced a clause in a fire insurance policy providing that no action for recovery of any claim shall be sustainable in any court unless commenced within six months after the fire itself, even though such actions were prohibited during most of the first three of those six months. In *Bartley* v. *National Business Men's Assn.*, 109 Ohio St. 585, 143 N. E. 386, the Supreme Court of Ohio approved the *Appel* case and applied it to a two-year

contractual limitation for suing an Ohio mutual protective association on a claim for accidental death. See also: *Modern Woodmen* v. *Myers,* 99 Ohio St. 87, 124 N. E. 48, upholding a strict adherence to limitations stated in the by-laws of fraternal benefit societies; *Portage County Mutual Fire Ins. Co.* v. *West,* 6 Ohio St. 599, emphasizing the reasonableness of short periods for commencing suits on claims against mutual companies; *Young* v. *Order of United Commercial Travelers,* 142 Neb. 566, 7 N. W. 2d 81, recognizing the validity in Ohio of the precise provision of the constitution of the society here at issue, and sustaining its effectiveness in Nebraska by force of the full faith and credit clause of the Constitution of the United States; and *Roberts* v. *Modern Woodmen,* 133 Mo. App. 207, 113 S. W. 726, sustaining, in Missouri, a one-year limitation in the insurance contract of an Illinois fraternal benefit society, in the face of a contrary local policy as to Missouri contracts limiting the time within which suits may be instituted. See also, *Riddlesbarger* v. *Hartford Ins. Co.,* 7 Wall. 386.

Starting with the recognized validity under the law of Ohio, of Article IV, § 11 of the constitution of the petitioning society, that society has a complete defense to the present action unless such § 11 is not enforcible in the courts of South Dakota because of a contrary public policy of that State. We examine first the claim that such a contrary policy exists, and then show why, on the principles established by this Court, the full faith and credit clause of the Constitution of the United States requires the courts of South Dakota to give effect to the public acts of Ohio as expressed in such § 11.

The general statutes of limitations which have been in effect in South Dakota throughout the period involved in this case have prescribed limits varying from 20 years

to one year according to the subject of the action.[21] "An action upon a contract, obligation or liability, express or implied," was required to be commenced within six years.[22] On the other hand the State required the insertion in every health or accident policy issued in the State, a standard contractual provision limiting to two years the time for bringing an action upon it.[23] Throughout this period, the South Dakota statutes, moreover, have expressed no hostility toward domestic or foreign fraternal benefit societies. In fact, they have provided for the incorporation, licensing and supervision of such societies in terms closely comparable to those of the statutes of Ohio.[24]

Both the alleged prohibition by South Dakota of such a contractual limitation as is contained in § 11 and the public policy of South Dakota against such limitations depend entirely upon its statute directed generally against contractual limitations upon rights to sue on contracts

---

[21] §§ 2294–2305, S. D. Rev. Code, 1919; § 33.0232, S. D. Code of 1939.

[22] § 2298, S. D. Rev. Code, 1919; § 33.0232 (4), S. D. Code of 1939.

[23] "No action at law or in equity shall be brought to recover on this policy prior to the expiration of sixty days after proof of loss has been filed in accordance with the requirements of this policy, nor shall such action be brought at all unless brought within two years from the expiration of the time within which proof of loss is required by the policy." § 3 (14), c. 229, S. D. L., 1919, at p. 235.

See also, § 31.1702 (14), S. D. Code of 1939. This section is indicative of a state policy approving the shortening of the general statute as applied to accident policies, but it does not apply directly to or affect transactions of fraternal benefit societies because they are excluded from the general insurance statutes and are placed under the licensing provisions quoted in note 10, *supra*. The petitioner's constitution, filed under that requirement, fully disclosed its provision on this subject. § 12 (3), c. 229, S. D. L., 1919; § 31.1708 (3), S. D. Code of 1939.

[24] Notes 11 and 12, *supra*.

which is quoted, *supra,* from § 897 of the Revised Code of South Dakota, 1919.[25]

The public policy so declared is not directed specifically against fraternal benefit societies or their insurance membership requirements. In this very case, however, the Supreme Court of South Dakota, in its decision below, expressly held that this statute applies to and renders void in South Dakota § 11 of Article IV of this society's constitution. We thus are confronted with an inescapable issue as to the unconstitutionality of an attempt, through this statute, to declare void in South Dakota a provision of the constitution of an incorporated fraternal benefit society which comes within the authorization of a public act of the State of Ohio and is valid under the laws of that State. This is not a new issue in this Court. It falls squarely within a line of decisions consistently upholding the applicability of the full faith and credit clause in support of comparable provisions in the constitution of such a society.

In *Royal Arcanum* v. *Green,* 237 U. S. 531, Mr. Chief Justice White, writing on behalf of a unanimous Court, pointed out that the full faith and credit clause there required the state of the forum (New York) to give effect to a law of the state of incorporation (Massachusetts) pursuant to which a fraternal benefit society had amended its constitution so as to increase the assessment rate upon the complaining members, although the trial court had found that their contract of membership was entered into, made and completed in the State of New York, and that under the law of that State, the member would not be bound by

---

[25] The present counterpart of that statute appears in § 10.0705 of the South Dakota Code of 1939:

"10.0705. *Restraint of legal proceedings; void.* Every provision in a contract restricting a party from enforcing his rights under it by usual legal proceedings in ordinary tribunals or limiting his time to do so, is void."

such increase.  206 N. Y. 591, 597, 100 N. E. 411, 412.  In terms which have not been overruled or modified by it in later decisions, this Court there explained why the full faith and credit clause requires controlling effect to be given to the law of the state of incorporation in interpreting and determining the enforcibility of the rights and obligations of members contained in the constitution and by-laws of such societies.  It said:

> ". . . , as the charter was a Massachusetts charter and the constitution and by-laws were a part thereof, adopted in Massachusetts, having no other sanction than the laws of that State, it follows by the same token that those laws were integrally and necessarily the criterion to be resorted to for the purpose of ascertaining the significance of the constitution and by-laws.  Indeed, the accuracy of this conclusion is irresistibly manifested by considering the intrinsic relation between each and all the members concerning their duty to pay assessments and the resulting indivisible unity between them in the fund from which their rights were to be enjoyed.  The contradiction in terms is apparent which would rise from holding on the one hand that there was a collective and unified standard of duty and obligation on the part of the members themselves and the corporation, and saying on the other hand that the duty of members was to be tested isolatedly and individually by resorting not to one source of authority applicable to all but by applying many divergent, variable and conflicting criteria.  In fact their destructive effect has long since been recognized.  *Gaines* v. *Supreme Council of the Royal Arcanum,* 140 Fed. Rep. 978; *Royal Arcanum* v. *Brashears,* 89 Maryland, 624.  And from this it is certain that when reduced to their last analysis the contentions relied upon in effect destroy the rights which they are advanced to support, since an

assessment which was one thing in one State and another in another, and a fund which was distributed by one rule in one State and by a different rule somewhere else, would in practical effect amount to no assessment and no substantial sum to be distributed. It was doubtless not only a recognition of the inherent unsoundness of the proposition here relied upon, but the manifest impossibility of its enforcement which has led courts of last resort of so many States in passing on questions involving the general authority of fraternal associations and their duties as to subjects of a general character concerning all their members to recognize the charter of the corporation and the laws of the State under which it was granted as the test and measure to be applied." *Id.* at 542–543.

In *Modern Woodmen* v. *Mixer,* 267 U. S. 544, this Court unanimously followed the same reasoning and Mr. Justice Holmes, in language previously quoted *supra,* emphasized the "complex and abiding relation" of a membership in a fraternal benefit society. He said, "as marriage looks to domicil, membership looks to and must be governed by the law of the State granting the incorporation." *Id.* at 551. In that case, the Court held that the full faith and credit clause required the state of the forum (Nebraska) to give effect to the law of the state of incorporation (Illinois) pursuant to which a by-law of the fraternal benefit society had been enacted requiring that the continued absence of any member, although unheard from for ten years, should not give his beneficiary the right to recover death benefits until the full term of the member's expectancy of life had expired. This was so held in the face of a rule of law in the state of the forum that seven years of unexplained absence was sufficient to establish death for purposes of such a recovery. This Court stated that neither the public policy of the forum nor the opinion of the Supreme Court of that State that the by-law was

unreasonable, nor the fact that the membership contract had been made in South Dakota, nor the fact that the by-law itself had been adopted several years after the membership relation had commenced, could affect this result. This Court said:

> "We need not consider what other States may refuse to do, but we deem it established that they cannot attach to membership rights against the Company that are refused by the law of the domicil. It does not matter that the member joined in another State." *Id.* at 551.

In *Broderick* v. *Rosner*, 294 U. S. 629, this Court, with Mr. Justice Cardozo noting dissent, applied this principle to a suit brought in a New Jersey court against certain citizens of New Jersey to recover unpaid assessments levied upon them as stockholders in a bank incorporated under the laws of New York. A New Jersey statute sought to prohibit, in the courts of New Jersey, proceedings for the enforcement of any stockholder's statutory personal liability imposed by the laws of another state, except in suits for equitable accounting, to which the corporation, its legal representatives, and all of its creditors and stockholders were to be necessary parties. Practically, this amounted to an attempt to bar such suits from the New Jersey courts. This Court, however, said "It is sufficient to decide that, since the New Jersey courts possess general jurisdiction of the subject matter and the parties, and the subject matter is not one as to which the alleged public policy of New Jersey could be controlling, the full faith and credit clause requires that this suit be entertained [without compliance with the special New Jersey statute]." *Id.* at 647.

Mr. Justice Brandeis, in stating the reasoning of the Court in the *Broderick* case, said:

> ". . . the full faith and credit clause does not require the enforcement of every right which has ripened into

a judgment of another State or has been conferred by its statutes. See *Bradford Electric Light Co.* v. *Clapper,* 286 U. S. 145, 160; *Alaska Packers Assn.* v. *Industrial Accident Comm'n, ante,* p. 532, at p. 546. But the room left for the play of conflicting policies is a narrow one. . . . For the States of the Union, the constitutional limitation imposed by the full faith and credit clause abolished, in large measure, the general principle of international law by which local policy is permitted to dominate rules of comity.

"Here the nature of the cause of action brings it within the scope of the full faith and credit clause. The statutory liability sought to be enforced is contractual in character. The assessment is an incident of the incorporation. Thus the subject matter is peculiarly within the regulatory power of New York, as the State of incorporation. 'So much so,' as was said in *Converse* v. *Hamilton,* 224 U. S. 243, 260, 'that no other State properly can be said to have any public policy thereon. . . .' . . . In respect to the determination of liability for an assessment, the New Jersey stockholders submitted themselves to the jurisdiction of New York. For 'the act of becoming a member [of a corporation] is something more than a contract, it is entering into a complex and abiding relation, and as marriage looks to domicil, membership looks to and must be governed by the law of the State granting the incorporation.' *Modern Woodmen of America* v. *Mixer,* 267 U. S. 544, 551." [26]  *Id.* at 642–644.

---

[26] Citing also for comparison, *Royal Arcanum* v. *Green,* 237 U. S. 531; *Hancock National Bank* v. *Farnum,* 176 U. S. 640; *McDermott* v. *Woodhouse,* 87 N. J. Eq. 615, 618, 619, 101 A. 375, 376; and for reference, *Canada Southern R. Co.* v. *Gebhard,* 109 U. S. 527, 537–538; *Hawkins* v. *Glenn,* 131 U. S. 319, 329; *Nashua Savings Bank* v. *Anglo-American Co.,* 189 U. S. 221, 229–230; *Harrigan* v. *Bergdoll,* 270 U. S. 560, 564.

618

In *Milwaukee County* v. *White Co.*, 296 U. S. 268, Mr. Justice Stone, speaking for the Court, said:

"The very purpose of the full faith and credit clause was to alter the *status* of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin." *Id.* at 276–277.

In *Sovereign Camp* v. *Bolin*, 305 U. S. 66, this Court unanimously approved the foregoing principles and authorities and applied them to a case that goes even beyond the issue presented by the instant case. In that case, Bolin joined a Missouri lodge of a fraternal benefit society incorporated in Nebraska. His certificate of membership was delivered to him in Missouri, and he paid his dues and assessments in Missouri. He was over 43 when he joined the society in June, 1896. At that time, one of its by-laws provided that a member joining at an age greater than 43 was entitled to life membership without payment of further dues or assessments after his certificate had been outstanding 20 years. On his certificate were endorsed the words "Payments to cease after 20 years," and it stated that, if in good standing, he would be entitled to participate in the beneficial fund up to $1,000 payable to his beneficiaries and to $100 for placing a monument at his grave. He paid his dues and assessments for the required 20 years but ceased doing so in July, 1916. Upon his death, his beneficiaries sued in a state court of Missouri to recover on his certificate. They were met by the defense that, in *Trapp* v. *Sovereign Camp of the Woodmen of the World*, 102 Neb. 562, 168 N. W. 191, the Supreme Court of Nebraska, in 1918, in a representa-

tive suit binding all members, had held that the by-law of the society, which had purported to authorize the "payments to cease" certificates, was *ultra vires* and void. In the suit by Bolin's beneficiaries, the Supreme Court of Missouri then held that from 1889 to 1897, including the time when Bolin joined the society, there had been no Missouri statute providing for the registration and filing of reports in Missouri by foreign fraternal benefit societies and that there had been no provision exempting them from the operation of the general insurance laws of Missouri. The Supreme Court of Missouri, accordingly, applied what it considered to be the Missouri law and public policy. On this basis, it disregarded the special status of the claim as one derived from the decedent's membership in a Nebraska fraternal benefit society and disregarded the Nebraska law, as interpreted by the Supreme Court of Nebraska, which had held the decedent's purported exemption from payments after 1916 to be *ultra vires* and void. The Missouri court treated his membership as a Missouri contract, subject to the general insurance laws of Missouri, interpreted his certificate as an ordinary Missouri contract, not *ultra vires* under the law of Missouri, and held the society liable upon it. This Court, however, reversed that judgment on the ground that, under the full faith and credit clause, the Missouri courts were required to accept the Nebraska law as to the validity of the corporate by-law.

Mr. Justice Roberts, writing for the Court said:

"We hold that the judgment denied full faith and credit to the public acts, records, and judicial proceedings of the State of Nebraska.

". . . The beneficiary certificate was not a mere contract to be construed and enforced according to the laws of the State where it was delivered. Entry into membership of an incorporated beneficiary society is more than a contract; it is entering into a complex

and abiding relation and the rights of membership are governed by the law of the State of incorporation. Another State, wherein the certificate of membership was issued, cannot attach to membership rights against the society which are refused by the law of the domicile.

.    .    .    .    .

"The court below was not at liberty to disregard the fundamental law of the petitioner and turn a membership beneficiary certificate into an old line policy to be construed and enforced according to the law of the forum. The decision that the principle of *ultra vires* contracts was to be applied as if the petitioner were a Missouri old line life insurance company was erroneous in the light of the decisions of this court which have uniformly held that the rights of members of such associations are governed by the definition of the society's powers by the courts of its domicile.

.    .    .    .    .

"Under our uniform holdings the court below failed to give full faith and credit to the petitioner's charter embodied in the statutes of Nebraska as interpreted by its highest court." *Id.* at 75 (citing *Modern Woodmen* v. *Mixer, supra,* and *Royal Arcanum* v. *Green, supra*), 78, 79.

This pronouncement as to the uniform holdings of this Court has not been repudiated or modified. In the present case, the decisions relied upon by the court below, in reaching a contrary result, deal with related but distinguishable situations.

In *Pink* v. *A. A. A. Highway Express,* 314 U. S. 201, this Court, in a unanimous opinion written by Mr. Chief Justice Stone, held that the full faith and credit clause does not apply to an action brought in the courts of Georgia

to collect assessments against an alleged member of an insolvent mutual insurance company, according to the terms of his contract of membership, unless such membership first be proved. The Court, however, recognized that corporate procedure in conformity with the statutes of the state of incorporation is entitled to full faith and credit so far as the necessity and amount of the assessment of stockholders' liability is concerned, and said at pp. 207–208: "The like principle has been consistently applied to mutual insurance associations, where the fact that the policyholders were members was not contested," citing *Royal Arcanum* v. *Green,* 237 U. S. 531; *Modern Woodmen* v. *Mixer,* 267 U. S. 544. And further:

"Where a resident of one state has by stipulation or stock ownership become a member of a corporation or association of another, the state of his residence may have no such domestic interest in preventing him from fulfilling the obligations of membership as would admit of a restricted application of the full faith and credit clause. But it does have a legitimate interest in determining whether its residents have assented to membership obligations sought to be imposed on them by extrastate law to which they are not otherwise subject." *Id.* at 210–211.

These recent references to the principle which is involved in the instant case constitute a significant recognition of its consistency with the decisions of this Court in related but distinguishable situations. The *Pink* case appropriately emphasized the distinction between, on the one hand, a sound local public policy which closely scrutinizes the proof of the entry into a certain relationship and, on the other hand, a local public policy which, in the face of the full faith and credit clause, would seek to eliminate important terms from that relationship after it has been entered into.

Contemporaneously with this development of the policy of this Court, applying the full faith and credit clause in support of membership obligations in fraternal benefit societies, it has considered the same clause in several related situations. For example, it has applied it in requiring the Minnesota courts to recognize the obligation of members of the safety fund department of a Connecticut life insurance company to meet assessments levied upon them pursuant to a mutual assessment plan valid under the laws of Connecticut. *Hartford Life Ins. Co.* v. *Ibs,* 237 U. S. 662. This was a unanimous opinion written by Mr. Justice J. R. Lamar. In another unanimous opinion in *Hartford Life Ins. Co.* v. *Barber,* 245 U. S. 146, at p. 150, Mr. Justice Holmes said, "The powers given by the Connecticut charter are entitled to the same credit elsewhere as the judgment of the Connecticut court. *Supreme Council of the Royal Arcanum* v. *Green,* 237 U. S. 531, 542." See also, *John Hancock Ins. Co.* v. *Yates,* 299 U. S. 178, 182–183.

Without reliance upon the full faith and credit clause, a somewhat similar result has been recognized in the protective effect of the Fourteenth Amendment of the Constitution of the United States, prohibiting the deprivation of any person of his property without due process of law. A like policy underlies § 10 of Article I of the Constitution, prohibiting a state from passing any law impairing the obligation of contracts. Accordingly, in *Home Ins. Co.* v. *Dick,* 281 U. S. 397, in an opinion by Mr. Justice Brandeis, this Court relied upon the Fourteenth Amendment in dealing with ordinary insurance policies. It upheld unanimously the effectiveness of a contractual one-year limitation upon the right to sue for recovery of a loss under a marine fire insurance policy, where such limitation was good in Mexico (in which country the insurance was written and was to be performed), as against a two-year general statute of limitations of the state of

the forum (Texas). In *Hartford Accident & Indemnity Co.* v. *Delta & Pine Land Co.*, 292 U. S. 143, in an opinion by Mr. Justice Roberts, the Court again relied upon the Fourteenth Amendment. There it upheld unanimously a 15-month contractual limitation upon the right to sue upon a fidelity bond. This limitation was valid in Tennessee, where such bond was entered into, and it was here upheld against the local policy of the state of the forum (Mississippi).

In a related but readily distinguishable series of cases dealing with conflicting claims arising under Workmen's Compensation Acts, emphasis has been placed upon the rule stated by Mr. Justice Stone, for a unanimous Court, in *Alaska Packers Assn.* v. *Comm'n*, 294 U. S. 532, 547. He there said:

> ". . . the conflict is to be resolved, not by giving automatic effect to the full faith and credit clause, compelling the courts of each state to subordinate its own statutes to those of the other, but by appraising the governmental interests of each jurisdiction, and turning the scale of decision according to their weight."

In *Pacific Ins. Co.* v. *Industrial Accident Comm'n*, 306 U. S. 493, again speaking for the Court, he added at p. 502:

> "And in the case of statutes, the extra-state effect of which Congress has not prescribed, as it may under the constitutional provision, we think the conclusion is unavoidable that the full faith and credit clause does not require one state to substitute for its own statute, applicable to persons and events within it, the conflicting statute of another state, even though that statute is of controlling force in the courts of the state of its enactment with respect to the same persons and events."

See also, *Magnolia Petroleum Co.* v. *Hunt,* 320 U. S. 430, in which, as Chief Justice, he upheld the controlling effect of the full faith and credit clause as against the law of the forum.

The language quoted from the *Pacific Ins. Co.* case, *supra,* also was quoted with approval in *Williams* v. *North Carolina,* 317 U. S. 287, at p. 296. In the latter case, on the basis of the full faith and credit clause, this Court gave effect to the law of the domicil in upholding the validity of a divorce, as against the law of the forum.

We find no conflict between the position taken in the instant case and that taken in the foregoing cases or in *Griffin* v. *McCoach,* 313 U. S. 498, *Hoopeston Co.* v. *Cullen,* 318 U. S. 313, or in other decisions of this Court upon which reliance has been placed to support an opposite conclusion.

Accepting the view, expressed in these related cases, that this Court should not give what Mr. Justice Stone called a mere "automatic effect to the full faith and credit clause," [27] this Court consistently has upheld, on the basis of evaluated public policy, the law of the state of incorporation of a fraternal benefit society as the law that should control the validity of the terms of membership in that corporation. The weight of public policy behind the general statute of South Dakota, which seeks to avoid certain provisions in ordinary contracts, does not equal that which makes necessary the recognition of the same terms of membership for members of fraternal benefit societies wherever their beneficiaries may be. This is especially obvious where the state of the forum, with full information as to those terms of membership, has permitted such societies to do business and secure members within its borders. There would be little sound public policy in permitting the courts of South Dakota to recognize an action to collect

---

[27] *Alaska Packers Assn.* v. *Comm'n, supra,* at p. 547.

the full benefits to be derived from a membership in the petitioner society, while, at the same time, nullifying other integral terms of that same membership which limit certain rights of beneficiaries to enforce collection of such benefits. It is of the essence of the full faith and credit clause that, if a state gives *some* faith and credit to the public acts of another state by permitting its own citizens to become members of, and benefit from, fraternal benefit societies organized by such other state, then it must give *full* faith and credit to those public acts and must recognize the burdens and limitations which are inherent in such memberships. In this case, the state of the forum has licensed the society to do business within its borders. It is concerned as much with the validity and fairness of the obligations to be enforced by assessments against its citizens who become members of the society as it is with the benefits to be claimed by those who become its beneficiaries. In this case, the full faith and credit clause, therefore, requires that effect be given to the six-month limit, prescribed by the society and authorized by Ohio, upon the right to commence this action. Such limit expired before this action was commenced and the judgment of the Supreme Court of South Dakota in favor of the respondent accordingly is

*Reversed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE MURPHY, and MR. JUSTICE RUTLEDGE join, dissenting.

The Order of United Commercial Travelers is a corporation chartered under the laws of Ohio with power to do a fraternal insurance business. It sells contracts of insurance in Ohio. South Dakota has licensed the corporation to sell fraternal insurance policies in that state. Under this permission, the corporation has an office, called a local council, in Black Hills, South Dakota, vested with

power to administer "the business and fraternal affairs of the Order."

The insured, a citizen and resident of South Dakota, applied to the Black Hills office for membership and an insurance policy. After the application had been accepted and an insurance certificate signed at the petitioner's home office in Ohio, it was "forwarded by the said Defendant corporation to South Dakota for delivery to the insured." From then until his death in South Dakota, the insured paid his premiums to the corporation's Black Hills office. During all that period his beneficiary lived in that state. This action was brought in a court of that state on behalf of the beneficiary after the corporation had refused to pay the claim.

The association denied liability because this suit had not been commenced within six months after the association had disallowed the beneficiary's claim. This is required by the corporation's constitution which is incorporated by reference into its contracts of insurance. And in a series of cases, cited in the Court's opinion, the Supreme Court of Ohio has held that suits brought in Ohio courts on mutual, stock company, or fraternal insurance contracts, may be barred by contractual arrangements between the parties which require that suit be brought within a shorter period than that provided by the Ohio limitations statutes.

But the South Dakota Supreme Court has held that a statute of that state which provides that "every provision in a contract restricting a party from enforcing his rights under it by usual legal proceedings in ordinary tribunals or limiting his time to do so, is void," S. D. Code § 10.0705 (1939), renders the limitation provision in this contract unenforceable in her courts. This Court today reverses the South Dakota decision on the ground that its refusal to enforce the private contract is a denial of full faith and credit to the "public Acts, Records, and judicial Proceedings" of Ohio. U. S. Const., Art. IV, § 1.

*First.* More than one hundred years ago this Court said that to require a state to apply the "limitation laws" of another state rather than its own would reduce it "to a state of vassalage," presenting the anomaly "of a sovereign state governed by the laws of another sovereign." *Hawkins* v. *Barney's Lessee,* 5 Pet. 457, 466–467. A few years later the Court was asked to hold that the full faith and credit clause barred a state from applying its own statute of limitations in a suit brought on a cause of action which had arisen in another state. On that question the Court did not "entertain a doubt"; the holding was that it could not "be even plausibly inferred" that the state in which the suit was brought was denied that power by the full faith and credit clause. *M'Elmoyle* v. *Cohen,* 13 Pet. 312, 324, 328. While the case then under consideration involved a suit on a judgment rendered in another state, the broad ruling was that, so far as the full faith and credit clause is concerned, a state has power to apply its own statute of limitations in every kind of action and without regard to where the cause of action arose.

The constitutional force of the *M'Elmoyle* refusal to require a forum state to give full faith and credit to a foreign state's statute of limitations is not weakened in the slightest by the fact that some states have seen fit to adopt "borrowing statutes." See *Cope* v. *Anderson, ante,* p. 461, at note 3. For other states, notably South Dakota here, have adopted statutes with purposes quite opposite to that of borrowing statutes. And under the *M'Elmoyle* rule, whichever limitations policy a forum state chooses to follow—to borrow or to refuse to borrow—it is free, so far as the full faith and credit clause is concerned, to do so.

The plain effect of today's decision is to overrule the *M'Elmoyle* case. And it does so, despite the fact that the holding of that case has never before been cited with disapproval; in fact, that holding has been repeatedly

approved and reaffirmed throughout the years since it was decided.[1]   The Court distinguishes the *M'Elmoyle* rule, and in fact relies generally for its decision upon the line of decisions in which *Modern Woodmen of America* v. *Mixer,* 267 U. S. 544, is the leading case.   But the statute of limitations was not in issue in the *Mixer* case, the case on which it relied, or the cases which have since relied on it. The *M'Elmoyle* case was not even cited in the Court's *Mixer* opinion; nor does anything said in it detract from the rule of the *M'Elmoyle* case that states can, despite the full faith and credit clause, apply their own statutes of limitation.[2]   Yet the Court now treats the *Mixer* case as controlling, and holds that the full faith and credit

[1] *Townsend* v. *Jemison,* 9 How. 407, 410; *Bank of Alabama* v. *Dalton,* 9 How. 522, 528; *Bacon* v. *Howard,* 20 How. 22, 25; *Christmas* v. *Russell,* 5 Wall. 290, 300; *Amy* v. *Dubuque,* 98 U. S. 470, 471; *Campbell* v. *Holt,* 115 U. S. 620, 626; *Campbell* v. *Haverhill,* 155 U. S. 610, 618.   See also *Chase Securities Corp.* v. *Donaldson,* 325 U. S. 304; *Michigan Ins. Bank* v. *Eldred,* 130 U. S. 693; *Bank of United States* v. *Donnally,* 8 Pet. 361; *M'Cluny* v. *Silliman,* 3 Pet. 270.

[2] The Court also refers to *Hartford A. & I. Co.* v. *Delta & Pine Land Co.,* 292 U. S. 143, and *Home Ins. Co.* v. *Dick,* 281 U. S. 397.   The Court does not rest its decision on the due process clause.   But the decisions in those cases went on the due process clause, and, far from supporting the holdings here, are actually inconsistent with it.   If they are to be followed they stand for the propositions that a state which has no interest at all, or only a minor interest, in the transaction sued on cannot, because of the mere accident of supplying the judicial forum, apply its own statute of limitations so as to defeat the terms of a contract valid in the jurisdiction where the obligation was initiated, negotiated, and completed.   The two cases cast considerable doubt on Ohio's power to have applied its limitation statute had this suit been filed there; conversely, they provide rather persuasive argument to support a contention that South Dakota's statute should control liability here in view of that state's considerable interest, even beyond that of providing the forum of this action.

clause deprives South Dakota of power to apply its own statute of limitations.[3]

But more than that, the "state of vassalage" to which the Court's decision here reduces South Dakota is not even in subordination to the laws of another state. The Court's opinion means that South Dakota must yield to a "law" adopted by the members of an Ohio-created private fraternal insurance association. That "law," appearing only in the private association's constitution, provides in the same kind of language that legislatures ordinarily use in their statutes of limitation that "No suit or proceeding, either at law or in equity, shall be brought to recover any benefits under this Article after six (6) months from the date of the claim for said benefits is disallowed by the Supreme Executive Committee."

The nearest that this private association's "law" comes to being a law of Ohio is that Ohio permits but does not require it. Because the private association's constitution was incorporated by reference in the policy contract, including the constitution's "statute of limitations," the Court now holds that this corporate "statute of limitations" prohibits application of South Dakota's statute of limitations. Thus the Court's holding is that an Ohio

---

[3] The Court takes the view that it is well established that a contract provision limiting the time within which suit can be brought may override a state's statute of limitations providing a longer period. For this proposition it cites *Riddlesbarger* v. *Hartford Ins. Co.*, 7 Wall. 386. That case came from a Federal Circuit Court in Missouri where the sole problem posed or decided was whether under Missouri law or general federal law a contract limitation violated the policy of Missouri expressed in its statute of limitations. But see *Guaranty Trust Co.* v. *York*, 326 U. S. 99. There was no full faith and credit question, due process question, or any other constitutional question. *M'Elmoyle* v. *Cohen, supra,* was not cited in the *Riddlesbarger* case. Nor was it relevant because no foreign law was put forward which might require Missouri to give full faith and credit to it.

private corporation's laws have a higher constitutional standing than an Ohio law or judgment would have—unless, as seems to be true, *M'Elmoyle* v. *Cohen, supra,* and subsequent cases approving it are now being overruled. It would be quite a radical departure from this Court's previous authorities to hold that the full faith and credit clause bars a government from applying its own statutes of limitations to suits brought in its courts, a power which, this Court said in its *M'Elmoyle* decision, governments have exercised since remote antiquity. *Id.* at 327. It is a far greater departure to hold that a state's limitation statute must take second place to the limitations rules adopted by a privately operated corporation.

It should come as quite a surprise to Ohio that its state policy can supplant South Dakota's statute of limitations, since Ohio's highest Court follows the *M'Elmoyle* rule that "Statutes of limitation relate to the remedy, and are, and must be, governed by the law of the forum; for it is conceded, that a court which has power to say when its doors shall be opened, has also power to say when they shall be closed." *Kerper* v. *Wood,* 48 Ohio St. 613, 622, 29 N. E. 501, 502. And the principle there announced was followed by the Ohio Supreme Court as late as 1943. *Payne* v. *Kirchwehm,* 141 Ohio St. 384, 48 N. E. 2d 224; *cf. Cope* v. *Anderson, ante,* p. 461.

*Second.* Leaving aside the *sui generis* features of a forum state's power over limitations of actions in its courts, the present holding violates other established rules concerning a state's power to govern its own local affairs and to protect from overreaching contracts persons in whom the state has a legitimate interest. See *Griffin* v. *McCoach,* 313 U. S. 498; *Pink* v. *A. A. A. Highway Express,* 314 U. S. 201. I had considered it well settled that if an insurance company does business at all in a state, its contracts are "subject to such valid regulations as the

State may choose to adopt." See *Whitfield* v. *Aetna Life Ins. Co.,* 205 U. S. 489, 495; *Knights Templars' & Masons' Life Indemnity Co.* v. *Jarman,* 187 U. S. 197, 202; *Hancock Mutual Life Ins. Co.* v. *Warren,* 181 U. S. 73, 75. This conception of broad state power has not been limited to particular kinds of laws or particular kinds of contracts of special kinds of insurance companies. Thus in regard to a mutual insurance company, the Court has held the terms of a policy governed by the law of Missouri where the contract was made in the face of a contract stipulation that they were to be governed by the laws of New York, the mutual company's domicil. *New York Life Ins. Co.* v. *Cravens,* 178 U. S. 389. For this Court concluded from inferences it found in the Missouri Court's opinion that compliance with Missouri law "was a condition upon the right of insurance companies to do business in the State." *Id.* at 395. It further held that Missouri had the same continuing power to regulate the business contracts of a foreign corporation permitted to do business there as it had over the contracts of domestic corporations. *Id.* at 400–401. And when a foreign building and loan association which did business with its members only [4] sought to avoid Mississippi usury laws by specifying that a loan contract with a Mississippi member was made in New York where the interest charged was not usurious, this Court held that Mississippi law governed and voided the contract. *National Mutual Bldg. & Loan Assn.* v. *Brahan,* 193 U. S. 635. The Court approved the conclusion of the Supreme Court of Mississippi that the association, by qualifying to do business in Mississippi, "had become 'localized' in the State, had accepted the laws of the State

---

[4] "The purpose of the Association is to make loans only to its members, and for the further purpose of accumulating a fund to be returned to its members who do not receive advances on their shares." *National Mutual Bldg. & Loan Assn.* v. *Brahan,* 193 U. S. 635, 636.

as a condition of doing business there, and could not, nor could [the Mississippi member] 'abrogate by attempted contract stipulations' those laws. See *Hancock Mutual Life Ins. Co.* v. *Warren,* 181 U. S. 73." *Id.* at 650. Because the contract was thus controlled by Mississippi rather than New York law, the Court held that "there is no foundation for the contention that full faith and credit were not given to the public acts and records of New York." *Id.* at 647.

The Court's opinion in the present case is apparently inconsistent with the foregoing cases which have established that state courts have a continuing authority to execute the public policy of the state by refusing to enforce contract provisions of foreign corporations permitted by the state to do business there—even though those corporations do business with members only. Today's opinion does imply, however, that South Dakota officials could have excluded this corporation from doing business in the state or could have revoked its license upon discovery of the foreign corporation's violation of the laws of the state. I cannot believe that the full faith and credit clause stays the hands of the state courts as instruments of state power in private litigation any more than it could forestall state authorities from revoking the association's license for persisting in making unlawful contracts.

*Third.* Another handle of South Dakota's power over this corporation derives, not from the corporation's acceptance of South Dakota law as a continuing condition of doing business, but from the number and importance of the incidents involved in the making and the performance of the specific contract here which occurred in South Dakota. Unless the Court's decision overrules [5] the long

---

[5] The Court purports not to overrule these cases for it states: ". . . [W]e do not rely upon the place of concluding the contract of membership or upon the place prescribed for its performance."

line of cases cited in the margin [6] this insurance contract was "made" and to be performed in South Dakota, and its validity is governed by the law of that state. Thus in *Hartford A. & I. Co.* v. *Delta & Pine Land Co.*, 292 U. S. 143, 150, Mississippi was required to enforce an insurance contract, unlawful in that state, although both the parties did business there, and although the suit on the contract was brought there, because the contract was valid in Tennessee, the state where the contract was held to have been made and which had the major connection with the whole transaction. For, said the Court, Mississippi "cannot extend the effect of its laws beyond its borders so as to destroy or impair the right of citizens of other states to make a contract not operative within its jurisdiction, and lawful where made." *Id.* at 149.

Before today, contentions that the full faith and credit clause overcomes the power of a state over a contract made and operative there have been flatly rejected by this Court. Thus in *American Fire Ins. Co.* v. *King Lbr. & Mfg. Co.*, 250 U. S. 2, an insurance company was authorized by Pennsylvania, the state of its incorporation, to write fire insurance on property outside that state. It was not licensed to do business by Florida, but accepted insurance applications through independent brokers there. Under the law of Pennsylvania where the applications were accepted and the policies written, brokers were apparently not authorized to waive contract

---

[6] *Hoopeston Canning Co.* v. *Cullen*, 318 U. S. 313; *Osborn* v. *Ozlin*, 310 U. S. 53; *Mutual Life Ins. Co.* v. *Johnson*, 293 U. S. 335, 339; *Northwestern Mutual Life Ins. Co.* v. *McCue*, 223 U. S. 234, 246–248; *Whitfield* v. *Aetna Life Ins. Co.*, *supra*, 495; *Knights Templars' & Masons' Life Indemnity Co.* v. *Jarman*, *supra*; *Chattanooga National Bldg. & Loan Assn.* v. *Denson*, 189 U. S. 408; *National Bldg. & Loan Assn.* v. *Brahan*, *supra*; *Wall* v. *Equitable Life Assur. Soc.*, 32 F. 273, affirmed *sub nom.* *Equitable Life Society* v. *Clements*, 140 U. S. 226.

provisions. But under Florida law the brokers were deemed agents of the Pennsylvania company with power to bind it by waivers. In answer to the contention that the Florida ruling denied full faith and credit to the law of Pennsylvania, this Court said that the case does not

". . . present an attempt of the Florida law to intrude itself into . . . Pennsylvania and control transactions there; it presents simply a Pennsylvania corporation having the permission of that State to underwrite policies on property outside of the State and the exercise of the right in Florida. And necessarily it had to be exercised in accordance with the laws of Florida. There was no law of Pennsylvania to the contrary—no law of Pennsylvania would have power to the contrary. There is no foundation, therefore, for the contention that full faith was not given to a law of Pennsylvania . . . ." *Id.* at 10.

*Fourth.* In interpreting the full faith and credit clause this Court has repeatedly insisted that it would weigh all the interests of each state involved before holding that the full faith and credit clause qualified one state's power to govern its own affairs. See *Pink* v. *A. A. A. Highway Express, supra,* 210–211, and cases there cited; *Magnolia Petroleum Company* v. *Hunt,* 320 U. S. 430, 436–437. I have recited the many bases for South Dakota's legitimate interest. What is the interest of Ohio to which the Court holds South Dakota must give full faith and credit?

It may be that the Court's view is that Ohio has an interest in securing uniformity of rights and obligations among all the policyholder-members throughout the country. For, says the Court, "If full faith and credit are not given . . . , the mutual rights and obligations of the members of such societies are left subject to the control of each state. They become unpredictable and almost inevitably unequal."

It is true that in situations involving the liability of stockholders for assessment obligations imposed by a corporate charter or the laws of a chartering state, the assessment obligation has been held to be governed by the laws of the chartering state. *Converse* v. *Hamilton*, 224 U. S. 243; *Broderick* v. *Rosner*, 294 U. S. 629. And assessments against fraternal as well as mutual insurance policyholders based on ownership rights and obligations which their insurance policies, like stock holdings, represent, have been similarly held to be controlled by the law of the state of the corporation's domicil. *Royal Arcanum* v. *Green*, 237 U. S. 531; *Hartford Life Ins. Co.* v. *Barber*, 245 U. S. 146; *Hartford Life Ins. Co.* v. *Ibs*, 237 U. S. 662. For insofar as a mutual or fraternal insurance policyholder assumes the assessment obligation which a stockholder may bear in other companies, he underwrites the risk that the corporation of which he is an owner might become insolvent. And that insolvency, particularly of an insurance company, would occur and generally become a responsibility of the chartering state where the principal business is conducted. The contingency of insolvency has been thought to give the chartering state greater and more direct interest in the extra-territorial collection of assessments against stockholders of corporations, than a state has in the day-to-day business transactions in which a corporation chartered by it engages in other states.[7]

---

[7] This contrast is dramatized by the consequences to Ohio's interest in the injury which would flow from South Dakota's disregard for this contract limitation which violates South Dakota's public policy. It is certainly a tenuous thread which would link South Dakota's refusal to enforce this and similar limitations to the undue depletion of the corporate funds. For it is unlikely that in calculating rates and risks, actuaries took into account the chance that the company might escape paying just claims because of company-imposed limitations on the time for bringing suit. On the other hand recovery of insurance claims often saves insurance beneficiaries from becoming public charges of the state of their residence.

This line of distinction has been clearly marked by the contrary result this Court has reached in cases concerning day-to-day business contracts made by foreign non-fraternal mutual insurance and membership loan companies with their policyholders and member-borrowers. In *New York Life Ins. Co.* v. *Cravens, supra,* at 400, it was urged that the fact that the mutual insurance company there was " 'the administrator of a fund collected from the policy holders in different States and countries for their benefit,' " demonstrated "the necessity of a uniform law to be stipulated by the parties exempt from the interference or the prohibition of the State where the insurance company is doing business." This contention was emphatically rejected. And in *National Mutual Bldg. & Loan Assn.* v. *Brahan, supra,* 636, 650, this Court, placing considerable reliance upon its previous *Craven* decision, held that contracts of a membership loan association whose controlling and central purpose, like the distinguishing "feature" relied upon by the Court here, was "to make loans only to its members, and for . . . accumulating a fund to be returned to its members," were, despite the full faith and credit clause, subject to the law of a state in which the association was doing business as a foreign corporation.

It seems apparent from these authorities that Ohio's interest in uniform administration of a corporation's contract obligations for the funds of a company created under its laws is not entitled to full faith and credit merely because of the communal interest of policyholder-members in that fund. And the fact, so heavily stressed by the Court, that the corporation was incorporated under the laws of Ohio so that its continued existence depends upon that law is plainly insufficient basis for a contention that, therefore, Ohio's interest demands full faith and credit for this contract provision.

Actually, it is not Ohio's interest in the uniform administration of the company's funds to which the Court gives full faith and credit. For otherwise, I should think, the opinion would cite and distinguish these cases which establish that this interest is not one entitled to full faith and credit. It is the limitations "law" of the corporate constitution enacted to protect its own interest, not the statutes of Ohio, which are held to bar this suit because it was not filed within six months. Thus it seems manifest that the Court is giving full faith and credit to the "laws" and the interest of the Ohio corporation. And the Court does this on the theory that the fraternal corporation's constitution which governs the terms of its contracts is "subject to amendment through the processes of a representative form of government authorized by the law of the state of incorporation." Apparently, it is felt that the individual South Dakota policyholder-member can protect himself from overreaching contracts within the framework of this "representative" intracorporate government which is subject to whatever regulation Ohio chooses to impose. Until today I had never conceived of the Federal Constitution as requiring the forty-eight states to give full faith and credit to the laws of private corporations on the theory that a policyholder-member's ability to protect himself through intra-corporate politics makes state protection of him unnecessary and unconstitutional. It is a naive assumption that a policyholder-member of a fraternal corporation like this does not need protection from his state. Moreover, if valid, this assumption would apply with equal logic to immunize these fraternal corporations from the laws of their domicils.

The conclusion reached by the Court that fraternal insurance companies are entitled to unique constitutional protection is not justified by the language of the Constitution nor by the nature of their enterprise. And our

previous decisions concerning fraternal insurance companies do not support the conclusion which the Court draws from the superficial distinguishing characteristics which these companies possess.

As I have pointed out, those cases which hold that assessments against fraternal policyholders in their capacity as stockholders are governed by the law of the company's domicil, have no relation to a fraternal company's obligation to a beneficiary of an insurance contract. Moreover, in *Sovereign Camp W. O. W.* v. *Bolin,* 305 U. S. 66, heavily relied on by the Court, the fraternal association was freed from liability in a state in which it was not authorized to do business because a judgment of the highest court of the state which had chartered the association had declared, in a class suit to which the claimant had been, in effect, a party, that the policy sued on had been issued *ultra vires.* Thus the *Bolin* case is merely a familiar example of enforcement of *res judicata* under the full faith and credit clause. A judgment of any state, whether chartering state or not, would be entitled to the same respect. Here, of course, there is no judgment to which the claimant was a party which is entitled to full faith and credit. And the power of the Ohio corporation, so far as Ohio law is concerned, to make a contract consistent with South Dakota policy is unquestioned.

The other case relied on heavily by this Court is *Modern Woodmen of America* v. *Mixer, supra.* In that case Mixer, the beneficiary, lived in Nebraska. While the record was not wholly clear, the insured had apparently previously lived in South Dakota, and the certificate seems to have been "issued" there. A by-law of the Woodmen, an Illinois association, provided that its certificate should insure against death but that "long continued absence of any member unheard of shall not . . . give any right to recover on any benefit certificate."

Nebraska, where Mixer brought the suit, but in which state the contract had not been made, had a rule of evidence that a presumption of death arises from seven years unexplained absence. Apparently considering the by-law "unreasonable," the Supreme Court of Nebraska enforced its long-continued absence rule of evidence and held the association liable. The Supreme Court of Illinois, where the association was chartered, had held the by-law reasonable in that it merely showed a purpose of the association to limit its insurance to death rather than to extend it to long-continued absences. *Steen* v. *Modern Woodmen of America,* 296 Ill. 104, 129 N. E. 546. It was on this record that this Court reversed the Nebraska court's decision in the *Mixer* case.

This reversal can be justified on the facts of the *Mixer* case, which are clearly different from the facts in the case before us. There was no conflict in *Mixer* between the policy of the state where the contract was made, and Illinois, the state of the association's domicil. For the contract apparently had been made in a third state, South Dakota, consistently with the laws of that state. Nor does it appear from the record of that case that the association had been licensed to do business so as to accept either the law of the state where the contract was made, or that of Nebraska where the suit was brought. Finally, as I have already indicated, no statute of limitations was involved in the *Mixer* case.

But it is said that language of the *Mixer* case means that the obligations of a fraternal insurance corporation are to be governed by the law of its domicil. If this language means that such an association is privileged to live above the law of the state where it does business, makes contracts, and is sued, I think that language should be repudiated. The purported differences between fraternal insurance companies and other reciprocal, co-opera-

tive and mutual insurers, are too fragmentary and inconsequential to justify any Constitutional difference in treatment. *Cf. Hoopeston Canning Co.* v. *Cullen,* 318 U. S. 313.

Neither in the *Mixer* case nor in the present one does the Court attempt to demonstrate, and I seriously question that a demonstration is possible, that the insurance business of a fraternal company is conducted differently in any important way from that of a mutual, reciprocal, or joint stock company. The insurance phase of this company is set apart from the fraternal phase after election to membership, even though payment of assessments levied for insurance purposes is made compulsory. The provisions of its constitution show that insurance terms and conditions are precisely like those of non-fraternal companies. Insurance funds are administered on a business basis, and they cannot be used for fraternal purposes. In short, the insurance program and activities reveal that this is an insurance company, run like other insurance companies. The only non-paper difference is that insurance is sold only to members of the fraternity.

Nor is it apparent to me that an individual policyholder-member in a remote community exercises any significant influence on the technical insurance aspects of a fraternal company's business. Certainly, he can no more control the policy contract provisions than could a mutual policy-holder or a member of a membership loan association. And the individual member would share as much and no more in the fraternal company's gains from overreaching contracts as would participants in these indistinguishable associations.

That fraternal-order insurance businesses such as petitioner's are of a magnitude to move each state to regulate them so as to protect its citizens can hardly be doubted. The best information obtainable shows that in 1944 frater-

nal life insurance businesses in the United States had aggregate assets of almost $1,500,000,000; income of $255,600,000; $6,794,300,000 insurance in force; and 7,582,000 outstanding certificates. During 1944 they spent $43,300,000 for agents and management.[8] There is, thus, every reason for giving the same force and effect to state regulation of fraternal insurance companies as is given regulation of all other insurance businesses.

*Fifth.* I fear that it may be significant that the Court has conspicuously refrained from stating in unmistakable terms that its new doctrine applies only to fraternal insurance companies. If, as the Court holds, the interest of Ohio or of its corporate creature does outweigh the interest of every state in which that creature does business, I see no sound basis in the facts or in the authorities cited by the Court for declining to apply this formula to almost every type of business corporation created in one state and doing business in another.

The effect of such a doctrine on the rights of states to govern themselves is graphically demonstrated by the insurance business. The five largest legal reserve life insurance companies in the United States, with total assets of approximately $15,000,000,000, have their home offices in or near New York and Connecticut. *United States v. South-Eastern Underwriters Assn.,* 322 U. S. 533, 541. The result of the Court's opinion, if later carried to its logical conclusion, would be that the policy obligations of all of these companies, in whatever state assumed, would be governed by New York or Connecticut law or that of nearby states, and that all of the other states would be deprived of power to pass legislation believed by them to be necessary to protect their own citizens against un-

---

[8] Statistical Abstract of the United States, Dept. of Commerce, Bureau of the Census (1946) 442.

642

conscionable contracts. By permitting its insurance corporations, particularly mutual companies, to make contracts barring an insured's access to state courts, New York, for example, could thus render all the other states helpless to provide a judicial haven for their own wronged citizens.

Such a doctrine is not only novel; it is revolutionary. I think the doctrine violates the very Constitution that it is our duty to interpret. For the Court today, in part, nullifies a great purpose of the original Constitution, as later expressed in the Tenth Amendment, to leave the several states free to govern themselves in their domestic affairs. Hereafter, if today's doctrine should be carried to its logical end, the state in which the most powerful corporations are concentrated, or those corporations themselves, might well be able to pass laws which would govern contracts made by the people in all of the other states.

I would affirm this judgment.