The CITY OF PARKERSBURG, WEST VIRGINIA et ·al., Plaintiffs,

v.

TURNER CONSTRUCTION COMPANY, a corporation, Defendant.

Civ. A. No. 74–9–P.

United States District Court, N. D. West Virginia.

Nov. 7, 1977.

William Bruce Hoff, Parkersburg, W.Va., for plaintiffs.

William D. Ginn, William H. Wallace, William B. Leahy, Thompson, Hine & Flory, Cleveland, Ohio, Fred L. Davis, Jr., Davis, Davis, Hall & Clovis, Parkersburg, W.Va., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HADEN, District Judge.

Plaintiffs filed this civil action in the Circuit Court of Wood County, West Virginia. The Defendant removed the action to this Court on the basis of diversity of citizenship, pursuant to 28 U.S.C. § 1332.

The action centers around the construction and interpretation of a contract between the Plaintiffs and the Defendant. Count I of the complaint seeks to establish a Guaranteed Maximum Cost provision in

the contract under the theory of waiver and estoppel. Count II seeks establishment of the figure through modification. Count III seeks reformation of the contract to insert such a provision. Neither party seeks damages.

The Defendant, in its answer, raised the affirmative defense that Plaintiffs failed to demand arbitration of this dispute which arose in connection with the contract, and that such was a condition precedent which bars this action. In a counterclaim, the Defendant also asks this Court to declare that the contract provides for the calculation of a Guaranteed Maximum Cost, but that Turner was not obligated to furnish such for the project until a future date when all contracts had been awarded to prime contractors for separable parts of the work.

On November 3, 1976, the Defendant moved for summary judgment on the ground that the Plaintiffs had failed to invoke the arbitration clause of the contract, which invocation was a condition precedent to litigation. The Plaintiffs asserted in the allegations of the complaint, and in resistance to the motion for summary judgment, that a demand for arbitration is not a precondition to litigation under West Virginia law, that Defendant waived its right to insist upon arbitration, and that *W. Va. Code*, 1931, 55–10–7, as amended, prohibited a valid agreement by it for arbitration of disputes without prior Court approval. This motion was denied as to Count III of the complaint, but ruling was reserved as to Counts I and II.

For the purposes of this action the parties have stipulated:

(1) That the City of Parkersburg is the owner of the Hospital;

(2) that the Hospital was under the operative control of the Board;

(3) that the membership of the Board was as stated in the styling of the complaint;

(4) that, between October 15, 1965, and October 16, 1974, Robert Evans Stealey was Chairman of the Board;

(5) that, from October 15, 1965, to date, Willard W. Jackson has been Secretary of the Board;

(6) that, from October 1, 1963, to date, Leo D. Carsner has been the Hospital's Administrator;

(7) that between February 1, 1972, and December 1, 1973, H. D. Conant was Vice-President and General Manager of Turner's Cleveland office and that, since December 1, 1973, he has been Senior Vice-President and Regional Manager of Turner;

(8) that between February 1, 1972, and December 1, 1973, A. P. Sanchez was employed by Turner as a Contract Engineer, becoming an Administrative Manager and Contract Manager on December 1, 1973, and, since December 1, 1974, being Vice-President and General Manager of its Cleveland office;

(9) that on May 18, 1972, Turner assigned J. A. Curnyn as its Project Manager upon the Hospital's job and from November 1, 1972, until January 1, 1974, he acted as Turner's General Superintendent;

(10) that since August 14, 1972, Paul Simonetta has been assigned by Turner as Project Engineer upon the Hospital's job;

(11) that John Williams and Associates of Cleveland, Ohio, was and is the Board's Architect;

(12) that the sources of the Board's funds for the construction of the additions and improvements in the Hospital were

(a) the Hospital's accumulated earnings;

(b) the amount voluntarily contributed in the Hospital's fund-raising drive; and

(c) the net proceeds of Parkersburg's $4,500,000.00 revenue bond issue;

(13) that Turner was employed by the Board as Construction Manager and served as such;

(14) that the work contemplated by the parties has been done, except the construction of the Surgery Wing and the furnishings of Groups II and III Equipment; and

(15) that the Minutes of Board meetings were prepared by Willard W. Jackson.

This action was tried to this Court beginning January 6, 1977, and concluding January 13, 1977. This Court having extensively reviewed all material available to the Court, including the pleadings, memoranda and arguments of counsel, and the documentary, oral, and deposition evidence received by this Court, does hereby render the following findings of. fact and conclusions of law:

## FINDINGS OF FACT

1. The City of Parkersburg, West Virginia, is a municipal corporation organized and existing under the laws of the State of West Virginia, is located in Wood County, West Virginia, and was at all times pertinent to this action the owner of the Camden-Clark Memorial Hospital [Hospital].

2. The Hospital is located in Parkersburg, Wood County, West Virginia, and was at all times pertinent to this action under the control of the Board of Trustees of Camden-Clark Memorial Hospital [Board].

3. Turner Construction Company [Turner] is a corporation duly organized and existing under the laws of the State of New York and having its principal place of business located in New York, New York. Turner is licensed to do business, and in fact does business in the State of West Virginia.

4. In early 1972, the Board through its architect, John Williams and Associates, sought cost estimates for the construction of a new hospital building from several large contractors, one of which was Turner.

5. The bid proposal forms sent out by the Architect requested an estimate of the total cost of the project.

6. In a letter dated March 23, 1972, which accompanied a form contract for the Board's review, Turner indicated that when the drawings were sufficiently complete, it could submit a Guaranteed Maximum Cost figure.

7. In Turner's response to the cost estimate request, the total cost figure was 6.2 million dollars. This figure was referred to in the cover letter as a "Budget Estimate." The letter also proposed that Turner partic-

ipate in the project "up to the establishment of the Guaranteed Maximum Cost or start of construction, whichever would be sooner, at no cost or obligation to the Owner." Attached to Turner's response were alternative contractual proposals. One of these provided for an arrangement under which the Hospital itself would let the contracts under Turner's supervision. At such time as the drawings were sufficiently complete to obtain meaningful subcontract proposals, Turner was to provide a Guaranteed Maximum Cost.

8. At a meeting held May 9, 1972, among the Board's Negotiating Committee, Turner representatives, and the architect, Turner's proposal was discussed. Mr. Carsner's rough notes of that meeting reflect that the Board told Turner that its budget for the project was 5.5 million dollars plus the architect's fee, and noted that Turner indicated it could do the job for that price.

9. The minutes of the May 16, 1972, meeting of the Board demonstrate that in the minds of the members of the Board the 5.5 million dollar figure was an "estimated cost."

10. The minutes of the June 20, 1972, meeting of the Board reflect that the Board anticipated signing a formal contract with Turner but had not done so as of that date.

11. An August 3, 1972, letter from Turner's Contract Manager to the Hospital Administrator reflects that as of that date no Guaranteed Maximum Cost had been established.

12. A first draft of the proposed contract between Turner and the Board was discussed on August 21, 1972. Turner, who had drafted the proposal, had intended to include a "boiler-plate" arbitration clause, but at the request of Mr. Stealey, who was an experienced attorney and the responsible party dealing on behalf of the Board, inserted a stricter arbitration provision which Mr. Stealey had written. This draft also indicated that a Guaranteed Maximum Cost would be prepared after "meaningful bids" were taken and contracts awarded.

13. A second draft agreement was transmitted on September 11, 1972. That draft included, at Mr. Stealey's request, a second paragraph in Section 7, the Guaranteed Maximum Cost provision. This paragraph preserved the concept that the Guaranteed Maximum cost was not to be prepared until all contracts were awarded and reinforced the proposition that once the Guaranteed Maximum Cost figure was calculated and accepted, Turner would then absorb certain elements of cost incurred in excess of that figure.

14. The minutes of the September 19, 1972, meeting of the Board reflect that Turner had promised to provide a Guaranteed Maximum Cost within six weeks.

15. A third draft was submitted on September 21, 1977. This proposal changed the name of the owner of the project from Camden-Clark Memorial Hospital to the Board of Trustees of Camden-Clark Memorial Hospital.

16. On September 27, 1972, Turner sent a final revision to the Board for execution. The final draft contained several revisions which Mr. Stealey had requested.

17. In a September 29, 1972, letter, Mr. Stealey informed Mr. Conant that he had reviewed the proposed contract and revisions and was prepared to execute the contract.

18. In another letter dated September 29, 1972, Mr. Stealey requested yet a further change relating to the payment of taxes by Turner. Accompanied by a letter dated October 3, 1972, Turner sent a new page to Mr. Stealey to be inserted in the final draft contract incorporating the changes requested by Mr. Stealey.

19. The final contract, although back-dated to September 7, 1972, was executed in late October and transmitted to Turner on October 31, 1972. The contract as executed reflects that a Guaranteed Maximum Cost would be supplied when meaningful bids had been taken and contracts awarded. The contract also contains the following arbitration provision requested by Mr. Stealey:

11.) *ARBITRATION*

a.) It is mutually agreed that all disputes arising in connection with this Contract shall be submitted to Arbitration in accordance with the provisions of the current Construction Industry Arbitration Rules of the American Arbitration Association and that all findings of fact by the arbitrators shall be conclusive and binding on both parties. It is further mutually agreed that the decision of the arbitrators shall be a prior condition to any right of legal action which either party to the Contract may have against the other.

b.) The demand for arbitration in connection with any dispute shall be filed in writing with the other party to the Contract. Any demand for arbitration shall be made within thirty (30) days after the dispute has arisen if practicable, but, in any event, no demand for arbitration shall be made after the date of Final Payment.

20. Both parties were intimately familiar with and totally cognizant of all the provisions in the contract. Both parties were completely aware that as of that time the contract provided no Guaranteed Maximum Cost figure.

21. Neither party was guilty of any fraud of inequitable conduct in concealing or misrepresenting the terms and meaning of the contract.

22. The contract as executed fully and accurately reflects the agreement of the parties at that time.

23. As of October 31, 1972, no Guaranteed Maximum Cost figure had been given to the Board.

24. The December 19, 1972, minutes of the Board reflect dissatisfaction with the progress of the architect in completing the necessary drawings. The failure of Turner to provide a Guaranteed Maximum Cost figure within six weeks of September 19, 1972, is attributable to this delay.

25. The architect was the agent of the Board; hired by, paid by, responsible to and directed by them.

26. Throughout the latter part of 1972, the Board and particularly Mr. Stealey, had received heavy criticism from a large contributor to the building program. The criticism, much of it published in area newspapers, was directed at the financing of the project and the contractual arrangements with Turner Construction.

27. The minutes of a January 17, 1973, Owner-Contractor meeting reflect that the purpose of the meeting was to clarify the Guaranteed Maximum Cost. The minutes make clear that all parties understood that, prior to that date, no Guaranteed Maximum Cost figure had been provided. At the meeting Turner and the Board representatives worked on the wording of a letter to be provided by Turner, so that the letter would clearly tie in to the contract.

28. As of the January 17 meeting, not all the requisite drawings had been prepared and not all the subcontracts had been bid.

29. On January 19, 1973, Turner sent the Board a letter, which was accompanied by a cover letter. The cover letter indicated that the main letter was an executed copy of an *Agreement* between Turner and the Board. The wording of the main letter is ambiguous, but it is the finding of this Court that the reasonable interpretation of this letter is that it established the Guaranteed Maximum Cost for the project at $5,843,139.00. In regard to the conflicting testimony as to the meaning and efficacy of the letter of January 19, this Court credits the evidence of the Plaintiffs and discredits the evidence of the Defendant.

30. Although one of the purposes in obtaining the letter was to satisfy the objections of significant financial donors to the project, the intent of the parties in formulating the letter of January 19 was not to mislead critics of the project, but rather to modify the contract to provide finally a binding Guaranteed Maximum Cost figure for the project.

31. A January 22, 1973, letter from Turner to Mr. Stealey further reinforces this interpretation. The letter reflects that the fee arrangement between Turner and the Board would be the 4% of total cost figure, consistent with the establishment of a Guaranteed Maximum Cost.

32. The Board reasonably relied upon Turner's assurance in its January 19 letter that $5,843,139.00 was the Guaranteed Maximum Cost figure. Not only did the Board pay Turner the higher percentage fee, but more significantly, they proceeded with construction of the new building as planned with limited public funds during a period of highly inflationary construction costs.

33. The minutes of the February 20, 1973, Board meeting reflect that on that date Mr. Stealey reported the Guaranteed Maximum Cost figure to the full Board.

34. During the period from January to August, 1973, several cost overruns developed. These overruns were at least partially attributable to the significant delay of the architect in getting the requisite drawings prepared. In October of 1972, a proposed schedule for the completion dates for final working drawings was prepared. Under this schedule final working drawings for all elements of the project would have been completed by the end of January, 1973. However, as of January 5, 1973, only ten per cent of the final working drawings were completed. Other critical drawings were not completed until many months later. For example, mechanical and electrical drawings were not completed until July, 1973.

35. The minutes of the June 19, 1973, Board meeting reflect that Mr. Stealey informed the Board that the delays in bidding and letting contracts were not the fault of Turner.

36. On August 29, 1973, at an Owner-Contractor meeting, Turner's representatives denied that it had agreed to a Guaranteed Maximum Cost.

37. Another Owner-Contractor meeting was held October 8, 1973, concerning the Guaranteed Maximum Cost. Turner stated that if it were forced to complete the Hospital according to plans, then the arbitration or litigation provisions of the contract would have to be invoked. Both Mr. Stea-

ley and Mr. Conant chose to pursue a compromised course of action rather than to pursue litigation or arbitration. According to the minutes, the meeting ended on a conciliatory note.

38. The overruns continued through December, 1973. In December, Mr. Stealey noted in a letter approving the letting of a subcontract that the Guaranteed Maximum Cost figure was no longer attainable, and that by letting the subcontract the Board did not waive their right to enforce the Guaranteed Maximum Cost.

39. Turner responded to that letter on January 4, 1974, stating that no Guaranteed Maximum Cost figure had been given and that under the terms of the contract the time for providing such a figure had not yet arrived.

40. At the January 15, 1974, Board meeting the dispute was discussed. It was noted that the contract called for any disputes to be arbitrated. The Board voted to retain William Bruce Hoff as special counsel with regard to the dispute.

41. The dispute which is the subject matter of this action arose at least prior to January 15, 1974. No facts or circumstances existed making it impracticable for the Board to seek arbitration.

42. At a January 17, 1974, meeting of the Building Committee, Mr. Stealey stated that there was a continuing and unsolvable disagreement with respect to the Guaranteed Maximum Cost and that the Board would turn the dispute over to legal counsel. The parties noted the existence of the arbitration provision. Mr. Stealey stated that he would discuss with counsel the avenues to be taken.

43. As of January, 1974, Turner Construction had been paid all that was currently owing them and construction of the Hospital and progressing. This Court finds, at that point in time, Turner had no basis for dispute and no reason to demand arbitration.

44. This action was commenced May 21, 1974.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1332.

2. This Court has personal jurisdiction over all parties to this action.

3. Issues of substantive law in this case are properly determined by reference to West Virginia law.

4. The Board has demonstrated by clear and convincing proof that Turner, by its letter of January 19, 1973, waived the contract provision delaying the Guaranteed Maximum Cost until all contracts were let. By that same letter, Turner provided the Board with a Guaranteed Maximum Cost figure of $5,843,139.00. The Board relied on the figure to their detriment, and, accordingly, Turner is estopped from denying its efficacy. See *United States Fidelity and Guaranty Company v. Landers Chevrolet, Inc.*, 310 F.Supp. 1107 (S.D.W.Va.1970); *Steinbrecher v. Jones*, 151 W.Va. 462, 153 S.E.2d 295 (1967).

5. In the negotiations concerning the Guaranteed Maximum Cost the Board is not guilty of unclean hands, nor guilty of laches in bringing this action.

6. The contract contains a clause which provides that "The Contract may be modified from time to time by mutual agreement of the parties in writing." § 16. It is the finding of this Court that the January 19, 1973, letter constituted an agreement of the parties in writing. (See January 19, 1973, cover letter.) As this agreement is based on the mutual assent of the parties and is authorized by the original contract, no further consideration need be given. It was within the contemplation of the parties that such modifications would need to be made to the contract, and the parties by § 16 of the contract authorized such modification by agreement and in writing without further consideration.

Therefore, the January 19, 1973, letter modified the contract to provide a Guaranteed Maximum Cost figure of $5,843,139.00 at that time.

7. The Plaintiffs alleged in the complaint that the dispute which is the subject of this lawsuit arose prior to August 28, 1973, and that "no facts or circumstances existed making it impracticable for either Turner or the Board to demand arbitration within a period of thirty days after the existing dispute arose." This Court has found that the dispute most definitely arose prior to January 15, 1974, and that nothing prevented the Board from seeking arbitration at that time.

■ 8. *W.Va.Code*, 1931, 55–10–7, as amended, cannot be read as a proscription preventing the Board from submission of disputes arising from the contract arbitration. The purpose of this section of the *Code* was to provide the permissive means whereby fiduciaries could be relieved with judicial approval from personal responsibility for arbitration awards adverse to the interests of their beneficiaries. It was not intended, however, to take away or prohibit the authority to contract to and submit any matter to arbitration, without having first proceeded as allowed by this statute. *Wamsley v. Wamsley*, 26 W.Va. 45 (1885); *Tennant v. Divine*, 24 W.Va. 387 (1884).

■ 9. The arbitration clause expressly provided that all disputes arising in connection with the contract were to be submitted to binding arbitration, and that the arbitrators' decision was to be a condition precedent to any right of legal action which one party might have against the other. The validity and effect of such express provisions has been settled law in West Virginia for some time. *Pettus v. Olga Coal Co.*, 137 W.Va. 492, 499–500, 72 S.E.2d 881, 885 (1952); *Condon v. South Side Railroad Co.*, 55 Va. (14 Grat.) 302 (1858). "By their contract, parties may lawfully make the decision of arbitrators [for] any third person a condition precedent to a right of action upon the contract." Sylb. Point 1, *Board of Education v. W. Harley Miller, Inc.*, W.Va., 221 S.E.2d 882 (1975). A most recent decision strongly endorses fulfillment of arbitration obligations before resort to Courts where the parties bargain on an equal basis, where the nature of the activity covered by the contract is susceptible to dispute resolution by arbitration, and where the language of the contract, expressly or by implication, requires arbitration. *Board of Education v. W. Harley Miller, Inc.*, W.Va., 236 S.E.2d 439 (1977). It is the opinion of this Court that the arbitration clause making submission of disputes arising in connection with the contract to arbitration a condition precedent to legal action is valid.

■ 10. The contract also provided that a written demand for arbitration shall be filed with the other party within thirty (30) days after the dispute has arisen, if practicable, but in no event later than the date of final payment under the contract. Such contractual agreements are valid and binding, if determined to be reasonable. *Order of Commercial Travelers v. Wolfe*, 331 U.S. 586, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947). This Court finds the thirty (30) day provision to be reasonable in light of the evident desire of the parties to have disputes quickly resolved while funds committed to the project remained available and while the circumstances of the dispute were fresh in the minds of potential witnesses. The question of compliance with the time limit, however, was not urged to the Court because the Board plainly and unequivocally alleged that it did not demand arbitration at any time before instituting this action. It is the opinion of the Court that failure to submit any dispute arising in connection with the contract to arbitration within the time limits prescribed by the clause is a bar to litigation unless waived by the opposing party.

■ 11. The Board contends that Turner, by its actions, waived the condition precedent of the arbitration clause. It is clear that the protection of an arbitration clause may be waived and that waiver may be inferred by conduct. *Browder v. County Court*, 143 W.Va. 406, 102 S.E.2d 425 (1958). Both at the time of and subsequent to the occurrence of the dispute, Turner continued to bill for and receive from the Board payments under the contract. Having been paid for all work done, it did not file a

written demand for arbitration of any dispute arising in connection with the contract. In this civil action, it seasonably pleaded the Board's failure to demand arbitration as an affirmative defense in bar to the action and, as well, asserted a counterclaim. *Rule* 8(e)(2) of the Federal Rules of Civil Procedure plainly permits defenses or claims to be pleaded alternately and inconsistently without prejudice to the pleader. *Halm Instrument Co. v. Sigma Engineering Service, Inc.*, 42 F.R.D. 416 (W.D.Pa.1967); *See Biggs v. Norfolk Dredging Co.*, 360 F.2d 360 (4th Cir. 1966). The matter was again raised by Turner and submitted on a motion for summary judgment. This Court reserved ruling on the motion and the Defendant preserved its contention when necessary throughout the trial. It is the opinion of the Court that no event occurring prior to litigation required Turner to demand arbitration. Its conduct did not imply waiver and the Court infers none. It did not abandon at trial its defense of the Board's failure to demand arbitration. Consequently, there was no waiver.

▮ 12. Counts I and II of the complaint and Defendant's counterclaim involved disputes which arose in connection with the contract and are thus barred by the failure of the parties to follow the requirements of the arbitration clause.

▮ 13. " 'In order to authorize reformation, the instrument must fail to express the parties' agreement or intention, either because of mutual mistake or because of mistake, inadvertence, or accident on one side and fraud or inequitable conduct on the other.' To warrant such reformation, the proof must be 'strong, clear and convincing.' " [citations omitted] *Lusher v. Sparks*, 146 W.Va. 795, 806, 122 S.E.2d 609, 615 (1969). In this case the contract accurately reflects the agreement of the parties at that time. Both sides were fully aware of the contents of the contract, and there was no fraud or inequitable conduct on the part of either party in the formation of the contract. Accordingly, this Court will not reform the contract as demanded in Count III of the complaint.

14. In light of the foregoing findings of fact and conclusions of law, objections asserted by Defendant under the Parol Evidence Rule are hereby overruled. Concerning other objections upon which the Court reserved ruling, objections asserted by the Defendant regarding the admissibility of documentary, testimonial and deposition evidence are hereby overruled and such objections by Plaintiffs are similarly overruled. Even if the Court had sustained such objections by the parties, the decision reached by the Court would not have been any different.

The foregoing constitutes the Court's findings of fact and conclusions of law in accordance with *Rule* 52, Federal Rules of Civil Procedure. Counsel for Defendant is directed to prepare a form of judgment consistent with the above findings and conclusions rendered by the Court.