**WEYERHAEUSER CORPORATION**
**d/b/a Cedar River Paper**
**Company, Plaintiff,**

v.

**TAMKO ROOFING PRODUCTS, INC.**
**and D.C. Taylor Company,**
**Defendants.**

**No. 02–141–LRR.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Dec. 17, 2003.

Patrick M. Roby, Cedar Rapids, IA, for Plaintiff.

Nathan John Overberg, Ahlers Cooney Dorweiler Haynie Smith & Allbee, Des Moines, IA, Wade R. Hauser, III, Ahlers Cooney Dorweiler Haynie Smith & Allbee, Des Moines, IA, Forrest W. Rosser, Carmichael & Rosser, Cedar Rapids, IA, Roger W. Stone, Simmons Perrine Albright Ellwood, Cedar Rapids, IA, for Defendants.

## ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

READE, District Judge.

This matter comes before the Court pursuant to the Motion for Summary Judgment (docket no. 16) of Defendant TAMKO Roofing Products, Inc. ("TAMKO").

On September 5, 2002, Weyerhaeuser filed this lawsuit against TAMKO in the Iowa District Court for Linn County. TAMKO removed the matter to this Court on September 27, 2002 on the basis that this Court has diversity subject matter jurisdiction. TAMKO invokes this Court's diversity jurisdiction inasmuch as complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00. 28 U.S.C. § 1332. Weyerhaeuser is a Washington corporation with its principal place of business in the state of Washington. TAMKO is a Missouri corporation with its principal place of business in Joplin, Missouri. D.C. Taylor is an Iowa corporation with its principal place of business in Cedar Rapids, Iowa.

## I. STANDARD OF REVIEW

Summary judgment is appropriate only when the record, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir.1997) (citing *Yowell v. Combs*, 89 F.3d 542, 544 (8th Cir.1996)). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999). In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus.*, 475 U.S. at 587, 106 S.Ct. 1348. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id.*

The moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 394 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must offer proof "such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

## II. FACTUAL BACKGROUND

The following facts are undisputed.

Plaintiff Weyerhaeuser Corporation ("Weyerhaeuser") owns and operates the Cedar River Paper Company, a paper-making plant in Cedar Rapids, Iowa. The Cedar River Paper Company facility was constructed from 1994 to 1996. Defendant D.C. Taylor Co. ("D.C.Taylor"), the roofing subcontractor, installed roofs on multiple buildings at the Cedar River Paper Company, including the roof over Paper Machine No. 1 and the roof over Paper Machine No. 2. D.C. Taylor used roofing products and material furnished by TAMKO.

On April 18, 1996, TAMKO issued a written limited warranty on the roofs. The Roofing System NDL Guarantee (the "guarantee") warrants TAMKO's product and the workmanship of the installer, D.C. Taylor, for 10 years from April 17, 1996, the date the roofing system was completed. Pursuant to the guarantee, TAMKO agreed to:

repair or cause to be repaired leaks in the roofing system (e.g., membrane exclusive of metal work and non-TAMKO approved flashings) attributable to ordinary wear and tear of the roofing system or workmanship deficiencies in application to the extent necessary to return the roofing system to a watertight condition.

The guarantee contains an "EXCLUSIONS" paragraph which states:

In addition, this TAMKO Roofing System Guarantee does not cover leaks or damages to the roofing system attribut-

able to one or more of the following conditions:

\*　\*　\*　\*　\*　\*

12. Splitting, cracking, blistering, delamination or separation of the membrane due to underlying materials (e.g. insulation).

The guarantee runs "to the owner of the TAMKO roofing system described below." The Cedar River Paper Company was identified as the owner of the roofing system. The guarantee further contains a non-transferability provision:

This limited warranty shall accrue and inure only to the benefit of the first consumer purchaser or owner of the TAMKO product and shall not be assigned, sold, or transferred in any manner whatsoever. Any assignment, sale or transfer of the warranty or the building to which TAMKO products are applied shall void all warranties contained herein or hereunder and all implied and statutory warranties including warranties of merchantability and fitness for a particular purpose.

The guarantee contains a one-year statute of limitations:

NO ACTION FOR BREACH OF THIS LIMITED WARRANTY SHALL BE BROUGHT LATER THAN ONE YEAR AFTER ANY CAUSE OF ACTION HAS ACCRUED.

At the time the Cedar River Paper Company's buildings were constructed and the guarantee was issued, the Cedar River Paper Company was an Iowa general partnership. The general partners were Weyerhaeuser Midwest, Inc. ("Weyerhaeuser Midwest"), a wholly owned subsidiary of Weyerhaeuser, and BE & K, Inc. ("BE & K") of Birmingham, Alabama. On July 2, 2001, Weyerhaeuser purchased the BE & K partnership interest. On December 30, 2001. Weyerhaeuser Midwest was dis-

solved, terminating the partnership. The Cedar River Paper Company became an operating division of Weyerhaeuser and the Cedar River Paper Company is currently not a legal entity. Rather, the Cedar River Paper Company is a fictitious name for Weyerhaeuser's paper plant. The Cedar River Paper Company transferred the land and buildings to Weyerhaeuser by warranty deed dated December 21, 2001.

The Cedar River Paper Company began complaining to TAMKO about blistering on the roofs in question as early as July 16, 1997. The Cedar River Paper Company subcontracts maintenance of its roof to an outside firm. In the spring of 2000, T & K Roofing, a contractor for the Cedar River Paper Company, inspected the roofs and "found the bad stuff." T & K Roofing had discovered ridges in the roof on Paper Machine No. 2. Mr. Don Summerhill, maintenance and engineering team leader at the Cedar River Paper Company, identified the ridges as a substantial concern. During the summer of 2000, the Cedar River Paper Company contacted TAMKO regarding the ridges on the roof of Paper Machine No. 2.

On or about July 24, 2000, Mr. Christopher Hammack, an Inspecting Services Specialist from TAMKO, inspected the roofs and took roof samples. On August 11, 2000, Mr. Hammack sent a letter to Mr. Summerhill regarding the results of his inspection of the Cedar River Paper Company roofs. Mr. Hammack stated:

> After inspection of the concerns of many large areas where the field sheet was blistered, it was determined that this problem is caused by positive pressure from within the structure migrating through the deck and causing the insulation to pull apart in areas. The hot, humid, air is then trapped by the roofing system. The item is not covered under the roofing system guarantee.

In response to Mr. Hammack's August 11, 2000 letter denying warranty coverage, Weyerhaeuser hired Mr. Gilbert Arnold of Advanced Roof Technology ("ART") in Louisville, Kentucky to provide an alternative explanation for TAMKO's evaluation of the blisters. Mr. Arnold prepared a report for Mr. Summerhill dated September 26, 2000. Mr. Arnold's report was precipitated by Mr. Hammack's August 11, 2000 letter. In the report, Mr. Arnold identified the cause of the ridging problems to be lack of adhesion of the membrane to the roof insulation. During his inspections he counted 35 ridges and 7 roof blisters. The ridges ranged in length from 3 to 20 feet. Mr. Arnold found "poor adhesion of the membrane to the roof insulation" and concluded "[t]he lack of adhesion of the membrane to the insulation could easily lead to wind blow off." Mr. Arnold opined that Mr. Hammack's "determination that positive pressures within the building are causing the ridging to have no basis in fact." Mr. Arnold made the following further conclusions:

> The ridges are obviously caused by improper asphalt application on the majority of this roof. Tamko's Roofing System NDL Guarantee clearly states that it covers a failure of the roofing materials or workmanship deficiencies. If there is any question that the asphalt application is far below the 23 lbs/ft required by Tamko, I recommend that a test cut be taken and submitted to an independent laboratory for testing.

> The ridges and blisters can be easily repaired by cutting them out and repairing the area with new plies of roof material. Of much greater concern however is the lack of adhesion in large areas of this roof. This roof is VERY susceptible to wind blow off in its present state.

This roof will NOT meet Factory Mutual wind uplift standards in the areas that we took test cuts. Unfortunately, this problem can not be easily fixed and would require replacement of large roof areas.

Mr. Summerhill concluded Mr. Arnold's report contradicted Mr. Hammack's August 11, 2000 letter denying warranty coverage. On October 4, 2000, Mr. Summerhill sent the ART report to TAMKO via facsimile transmission.

Mr. Hammack revisited the roofs on November 9, 2000. On November 13, 2000, he again sent a letter to Mr. Summerhill denying coverage for the blister and ridging problem under the warranty. In his letter, Mr. Hammack stated:

> The second section, which is the high roof, TAMKO, as a sales rule, will supply the roofing material that is necessary for the current blister repairs. These repairs are not TAMKO's responsibility as they appear to be caused by a migration of moisture from the building's interior, which is not covered under the TAMKO Roofing System Guarantee. The additional cost involved with these repairs will be covered by Cedar River Paper Company.

After Mr. Summerhill received and reviewed the November 13, 2000 letter, he understood that TAMKO was denying Cedar River Paper Company's warranty claims related to the blisters.

In February of 2001, the Brown, Healey, Stone & Sauer architectural firm (the "Brown Healey firm") worked with Raiche Industrial Consultants, Inc. ("Raiche") to prepare a proposal to the Cedar River Paper Company for study of the roof issues. On February 6, 2001, Mr. Steve Emerson, a principal of the Brown Healey firm, sent to Mr. Ken Raiche, a principal of Raiche, an e-mail that stated, "[t]his study will provide detail and opinions to use

against TAMKO in a lawsuit or pursuit of replacement costs."

In May of 2001, the Brown Healey firm and Raiche produced a roof evaluation report for the Cedar River Paper Company. The report, dated May 10, 2001, stated that there was moisture infiltration into the roofing insulation around the perimeter of the Paper Machine No. 2 building. On May 15, 2001, Mr. Tom Lauer, a Loss Prevention Specialist with Factory Mutual Insurance Company, performed additional testing on the roof of the Paper Machine No. 1 building and determined that the roof had moisture infiltration issues similar to the roof on the Paper Machine No. 2 building. Mr. Lauer stated in his May 29, 2001 report that "[i]t is now known that the Paper Machine 1 and 2 roof coverings are in deteriorated condition and more susceptible to wind loss."

On July 23, 2001, Mr. Helmut Wallenfels, Weyerhaeuser's legal counsel, sent TAMKO a letter stating that Weyerhaeuser considered the roof "defective" and that the roof would be repaired or replaced, where necessary, in the next few months.

On August 13, 2001, Mr. Frederick O'Connor, Corporate Director of Commercial Roofing Systems at TAMKO, wrote Mr. Wallenfels as follows:

> The Cedar River Paper Company is entitle[d] to perform any roofing work whatsoever to their facility; however, any work on TAMKO System Warranted Roofs beyond that which has been authorized by TAMKO is the sole responsibility of the Cedar River [Paper] Company. In addition, unauthorized repairs can [jeopardize] the warranty for these roofs.
>
> I am including a copy of the letter to Mr. Don Summerhill from [Mr.] Chris Hammock, a TAMKO Inspection Service

Specialist, that indicates the extent to which TAMKO has agreed to affect work on the warranted TAMKO roofs in question at the Cedar River Paper Company.

In a letter dated September 12, 2001, Mr. O'Connor wrote Mr. Wallenfels informing him that TAMKO had concluded that complete re-roofing was neither necessary nor covered by the system guarantee.

On September 15, 2001, Mr. Summerhill sent an e-mail to Mr. Wallenfels which stated, "We have never had leaks. That is not our issue. The issue is the layers of roofing material (roof membrane, perlite, and insulation) not adhering and the possibility of the roof blowing off." Mr. Summerhill also stated, "When Jerry Ross and Chris Hammick are here, I am curious what they will say regarding the blisters and re-roof."

Mr. Summerhill testified in deposition that he understands that TAMKO's position concerning the roof problems has not changed since August of 2000 when Mr. Hammack sent the first letter denying warranty coverage:

Q. I understand why—physically why you did what you did. All I'm asking you is when you got this letter on May 3 of 2002 or shortly thereafter that came from Mr. O'Connor, did you understand that TAMKO's position still was that the problems with these roofs were not covered by the guarantee?

A. That's what they say.

Q. And that's what they had been saying since clear back in August of 2000 when Chris Hammack sent that first letter, correct?

A. That's why we're here today, unless they change their mind.

Mr. Gerry Kneeland, an architect with the Brown Healey firm who has been identified as an expert witness for Plaintiff, stated in deposition that the moisture that is found in the insulation in the perimeter of the roofs "definitely" came from inside the building. He also testified that the moisture travels from inside the building through gaps in the concrete side walls and the roof deck, travels around the vapor retarder, hits the underside of the roof membrane, condensates and drips back down onto the insulation. According to Mr. Kneeland, the moisture getting into the perlite insulation caused the perlite to deteriorate, eliminating the adhesion between roof membrane and the perlite insulation, which caused the need to totally replace the roofs. Mr. Kneeland is unaware of any significant leak issues with the roofs. Mr. Kneeland cannot connect any of the minor leak issues to defects in the membrane or workmanship deficiency in the membrane's installation. When asked if he was aware of any instances on any of the roofs where there had been leaks into the building from outside the roof membrane, Mr. Kneeland stated, "Not any specific instance. I know they have had water into the building but whether it was—what it was from and at what instance, I don't know." When asked about a specific leak where the low roof abutted the west side of Paper Machine No. 1, Mr. Kneeland testified that he did not know what caused the leak even though he had looked at several potential causes.

Weyerhaeuser's September 5, 2002 Complaint alleged a breach of warranty claim against TAMKO. On August 11, 2003, TAMKO filed a Motion for Summary Judgment seeking dismissal of Weyerhaeuser's Complaint in its entirety. On August 15, 2003, Weyerhaeuser filed an Amended and Substituted Complaint, adding a breach of contract claim against D.C. Taylor. No additional claims were made

against TAMKO. Weyerhaeuser's Amended and Substituted Complaint contains two counts. Count I alleges a breach of contract claim against D.C. Taylor. Count II alleges a breach of warranty claim against TAMKO.

### III. CONTENTIONS OF THE PARTIES

In its Motion for Summary Judgment, TAMKO contends Weyerhaeuser's Complaint should be dismissed because: (1) Weyerhauser has no rights under the guarantee because the guarantee is not transferable and the guarantee was issued to Cedar River Paper Company; (2) any claim based upon the guarantee is barred by the one-year limitations period contained therein; and (3) Weyerhaeuser cannot create a submissible issue of fact with respect to TAMKO's alleged breach of warranty.[1] In response, Weyerhaeuser argues that: (1) there was no transfer of the guarantee; (2) Weyerhaeuser filed its action within one year of the time its cause of action accrued; and (3) there is clearly a breach of warranty.

### IV. ANALYSIS

#### A. Transfer of the Guarantee

TAMKO argues that pursuant to the anti-transfer provision contained in the guarantee, the transfer of the Cedar River Paper Company to Weyerhaeuser voided the guarantee. The guarantee states that "this limited guarantee shall accrue and inure only to the benefit of the first consumer purchaser or owner of the TAMKO product and shall not be assigned, sold, or transferred in any manner whatsoever."

It is axiomatic that so long as their agreements are not contrary to public policy and do not violate the law, parties are free to contract as they please. *Rogers v. Webb,* 558 N.W.2d 155, 157 (Iowa 1997). The Court therefore finds that the guarantee for which the parties freely contracted validly prohibits the transfer of the guarantee.

The undisputed facts in this case show that when the guarantee was issued, the buildings at issue were owned by the general partnership that owned the Cedar River Paper Company. The general partnership was terminated on December 30, 2001, when Weyerhaeuser Midwest was dissolved. The party with which TAMKO had contracted for the guarantee therefore no longer was in existence. *See Wolf v. Murrane,* 199 N.W.2d 90, 98 (Iowa 1972) ("Upon dissolution, the partnership ... ceases to exist ...."). The Cedar River Paper Company then became an operating division of Weyerhaeuser. The Cedar River Paper Company currently is not a legal entity. The Court finds that the dissolution of the general partnership and the subsequent ownership of the Cedar River Paper Company by Weyerhaeuser constitutes a change of ownership triggered the anti-assignment provision of the guarantee. The Court notes that Weyerhaeuser has not cited any controlling authority that would support a contrary result. Therefore, the Court grants summary judgment in favor of TAMKO.

#### B. Limitations Period

Even if the Court had held that the guarantee was not voided by the transfer of ownership of the Cedar River Paper

---

1. The Court notes that TAMKO seeks dismissal of Weyerhauser's entire Complaint. However, Weyerhauser's Amended and Substituted Complaint asserts a separate count against D.C. Taylor in Count I. The instant Motion for Summary Judgment does not address Weyer-

haeuser's claims against D.C. Taylor. The Court will therefore treat TAMKO's Motion for Summary Judgment as seeking dismissal of Count II of Weyerhaeuser's Amended and Substituted Complaint.

Company, the Court still would grant summary judgment in favor of TAMKO on the basis that Weyerhaeuser failed to file its Complaint within the limitations period provided in the guarantee. In the absence of a controlling statute to the contrary, parties may, by agreement, modify a statutory period of limitation, provided the shorter period itself is reasonable. *Order of United Commercial Travelers of America v. Wolfe,* 331 U.S. 586, 589, 67 S.Ct. 1355, 91 L.Ed. 1687 (1947). Here, Weyerhaeuser does not argue that the contractual limitation period is unreasonable and the Court finds that there is no basis to find that the one-year limitation of actions provision in the guarantee is not reasonable. Thus, the Court holds that Weyerhaeuser's breach of warranty claim against TAMKO is subject to a one-year limitations period. The parties agree that Weyerhaeuser's cause of action accrued when TAMKO breached the guarantee. *See Brown v. Ellison,* 304 N.W.2d 197, 200 (Iowa 1981) (holding that under discovery rule, limitations period commences when the contract is breached). TAMKO argues that Weyerhaeuser knew about the facts underlying the claim—TAMKO's refusal to provide warranty coverage—no later than August 11, 2000. Therefore, TAMKO asserts that when Weyerhauser commenced this lawsuit on September 5, 2001, it was too late.

Weyerhaeuser responds that its September 5, 2002 Complaint was timely filed because Weyerhaeuser first noted serious problems with the roofs in the spring of 2001 and because TAMKO's breach of the guarantee first occurred on September 12, 2001, the date on which Mr. Fredrick O'Connor, Corporate Director of Commercial Roofing Systems at TAMKO, wrote to Mr. Wallenfels and informed him that TAMKO had concluded that complete reroofing was neither necessary nor covered by the system guarantee. Weyerhaeuser further contends that all of its concerns prior to the spring of 2001 had to do with minor roof problems; it was not until the spring of 2001 that Weyerhaeuser began the investigation which led to the conclusion it was necessary to replace the roof.

Weyerhaeuser's Amended and Substituted Complaint alleges that:

8. In the summer of 2000, Cedar River Paper Company became concerned about the condition of the roof and retained various consultants to conduct studies to determine what problems, if any, existed and what work needed to be done to address the problems.

9. The investigation disclosed that due to defects in the roofing system, it was necessary to replace the roof on Paper Machine No. 2, which work was performed during the summer of the year 2002, and thereafter.

10. Further investigation disclosed that the roof over Paper Machine No. 1, as well as the roofs over the administration building and the administration upper level also needed to be replaced because of deficiencies. Some of that work has been completed as of the date of the filing of this Amended and Substituted Complaint and the remainder will be concluded in the future.

As alleged in its Amended and Substituted Complaint, Weyerhaeuser discovered the blistering at issue in the summer of 2000. TAMKO denied warranty coverage relating to roof blistering and ridging on no less than three occasions: August 11, 2000, November 13, 2000, and August 13, 2001.

The Court finds that Weyerhaeuser's cause of action relating to breach of warranty clearly accrued no later than August 11, 2000. Therefore, Weyerhaeuser's breach of warranty claim against TAMKO

shall be dismissed as untimely because it accrued outside the limitations period agreed upon by the parties. The Court need not address TAMKO's third argument, that is, whether Weyerhaeuser can create a submissible issue of fact with respect to TAMKO's alleged breach of warranty, because the Court finds TAMKO's first two arguments dispositive.

### V. CONCLUSION

**IT IS HEREBY ORDERED** that:

1. Defendant TAMKO Roofing Products, Inc.'s Motion for Summary Judgment (docket no. 16) is GRANTED.

2. Count II of the Amended and Substituted Complaint is hereby DISMISSED with prejudice.

3. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no reason for delay and therefore directs entry of this Order as a final judgment in favor of TAMKO and against Weyerhaeuser that is immediately appealable.

4. This case shall proceed to trial on Plaintiff's claim of breach of contract against D.C. Taylor in Count I.

5. The parties are encouraged to explore settlement.